UNITED STATES of America ex rel. TOM WE SHUNG, Relator,

v.

John L. MURFF, as District Director of the Immigration and Naturalization Service of the United States, Department of Justice, for the District of New York, or such person, if any, who may have said Relator in custody, Respondent.

United States District Court
S. D. New York.

July 29, 1959.

Spar, Schlem & Burroughs, Martin A. Burroughs, New York City, of counsel, for relator.

Arthur H. Christy, U. S. Atty., New York City, Roy Babitt, Special Asst. U. S. Atty., New York City, of counsel, for respondent.

WEINFELD, District Judge.

Tom We Shung, the relator, by this habeas corpus proceeding, challenges the validity of an exclusion order which directs his deportation to the mainland of China via Hong Kong. This attempt to execute the exclusion order is the culmination of more than eleven years of litigation before the immigration authorities and the Courts, in which Shung unsuccessfully contended that he was entitled to admission to the United States as the minor son of Tom Wing, an American citizen and an honorably discharged veteran of World War II.[1]

Shung, a native of China, arrived at San Francisco in November 1947. His claim that he was derivatively entitled to admission was referred to a Board of Special Inquiry which, after a hearing, found that he had failed to establish satisfactorily that he was the blood son

---

1. 59 Stat. 659 (1945). This provision, by its own terms, expired in 1948. All applications for admission under it had to be made within three years of the date on which it became effective, December 28, 1945.

of Tom Wing. Accordingly, Shung was denied admission in February 1949 and ordered excluded. There followed a long series of litigated activities before administrative agencies and the Courts. Detailed reference to these is necessary in view of relator's contention that notwithstanding prior adverse rulings, he is, nonetheless, entitled at this time to a de novo hearing to establish his immigration status.

The order of the Board of Special Inquiry was confirmed by the Commissioner of Immigration and Naturalization in April 1949. The Board of Immigration Appeals, in July 1949, dismissed the appeal. In December 1949 the Board denied Shung's application to reopen the hearing and to reconsider the matter. It found that proffered new evidence, of a documentary nature, "in no wise reconcile[d] the many discrepancies contained in the evidence in the record".

The relator's efforts to gain admittance then shifted to the Courts. In 1952 he instituted an action for a declaratory judgment [2] and to review the determination of the Board under section 10 of the Administrative Procedure Act.[3] He advanced various contentions, attacking both the procedural aspects of the hearings and the findings by the Board of Special Inquiry. All were rejected by the District Court which found that Shung had been accorded a fair hearing and that the record justified the action taken.[4] The Court of Appeals affirmed the judgment and expressly agreed with the conclusion of the District Court.[5] Interestingly, although the Court of Appeals determined the matter upon the merits, it noted a question as to Shung's right to test the validity of the exclusion order by a declaratory judgment action instead of by a habeas corpus proceeding. The postured question was answered by the Supreme Court which vacated the judgment, and directed dismissal of the complaint on the ground that the only remedy available to an excluded alien was a writ of habeas corpus.[6]

In the meantime, the Immigration and Nationality Act of 1952 had become effective. Based upon that act and the Supreme Court's decision in Shaughnessy v. Pedreiro,[7] Shung instituted a second declaratory judgment action in the District of Columbia, making the same contentions and seeking the same relief as in the first action. His complaint was dismissed on the ground that habeas corpus still was the sole remedy available. The Court of Appeals reversed,[8] and the Supreme Court affirmed, holding that under the Immigration and Nationality Act of 1952 the validity of exclusion orders, as well as expulsion orders, was subject to challenge either by declaratory judgment or by habeas corpus.[9]

The relator did not confine his efforts to gain admission to the Courts. While his first declaratory judgment action was pending in the Court of Appeals, he moved for reconsideration, and attacked the validity, of the exclusion order upon additional grounds. These were considered by the Board of Immigration Appeals and rejected in August 1953. In 1957 still another motion was made for

2. 28 U.S.C.A. § 2201.

3. 60 Stat. 243 (1946), 5 U.S.C.A. § 1009.

4. Tom We Shung v. McGrath, D.C.D.C. 1952, 103 F.Supp. 507.

5. Tom We Shung v. Brownell, D.C.Cir., 1953, 207 F.2d 132.

6. 1953, 346 U.S. 906, 74 S.Ct. 237, 98 L. Ed. 405. The Court merely cited Heikkila v. Barber, 1953, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972, an expulsion rather than an exclusion case under the Immigration Act of 1917, in which it held that in spite of section 10 of the Administrative Procedure Act, the only means available for review of a deportation order was a writ of habeas corpus.

7. 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L. Ed. 868, in which the Court held that an alien ordered deported under the 1952 act might test the legality of the order in a declaratory judgment action.

8. 1955, D.C.Cir., 227 F.2d 40, 97 U.S.App. D.C. 25.

9. Brownell v. Tom We Shung, 1956, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225.

reconsideration. This time the Board granted his application.[10] A further hearing was conducted before a Special Inquiry Officer. Blood test evidence was received, additional documentation offered, and further testimony taken. In December 1957 the Special Inquiry Officer filed his opinion, in which it was found again that the relator was excludable. The Board of Immigration Appeals sustained the order of exclusion in May 1958.

During the long course of the administrative and judicial proceedings, Shung has been at liberty in the United States.[11] He was released from custody upon bond in September 1948 and remained at large until September 1958 when he was taken into custody for the purpose of effecting his exclusion.[12] Thereupon, the present habeas corpus proceeding was instituted.

■ Before considering the relator's various contentions, it is important to emphasize that the instant case is governed by the exclusion and not the expulsion provisions of the Immigration Act. The return of aliens who seek and who are denied admission into the United States is governed by the exclusion provisions, whereas the deportation of aliens who have already gained admission, whether legally or illegally, is governed by the expulsion provisions of the act.[13] Congress has set up different procedures and remedies for dealing with each of these two well-defined classes of aliens.

Shung, in contemplation of law, has never been in the United States. The fact that since September 1948 he has been at large on bond under an administrative order and for eleven years enjoyed what has euphemistically been referred to as a "temporary haven"[14] within the United States while he litigated his claim for admission, did not alter his status as an excluded alien.[15] However one may view the fiction, he is still, in theory of law, "on the threshold of initial entry".[16] Thus, Shung's various contentions must be considered within the confines of the relevant exclusion provisions of the law.

■ Shung first contends that he is entitled to "a hearing de novo under this Writ to establish his immigration status". The fundamental fact question of his status—whether or not he is the blood son of Tom Wing—upon which rests his claim to admission, has been entrusted by the Congress to an administrative

---

10. The motion was granted upon condition, based upon relator's proffered stipulation, that a third action which he instituted in the District of Columbia be discontinued. In accordance with the stipulation, the action was discontinued.

11. He was paroled in accordance with the then existing administrative procedure now sanctioned by statute. Immigration and Nationality Act of 1952, § 212(d)(5), 66 Stat. 188, 8 U.S.C.A. § 1182(d)(5).

12. See Leng May Ma v. Barber, 1958, 357 U.S. 185, 188, 78 S.Ct. 1072, 2 L.Ed.2d 1246. The Immigration Service permitted relator to remain on parole pending determination of this proceeding.

13. The distinction between "exclusion" and "expulsion" is noted by the Supreme Court in Leng May Ma v. Barber, 1958, 357 U.S. 185, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246. The Court there points out that the use of the word "deportation" in Chapter 4 of Title II of the Immigration and Nationality Act of 1952, dealing with exclusion proceedings, "to refer to the return of excluded aliens from the country * * * reflects none of the technical gloss accompanying its use as a word of art in Chapter 5," which deals with aliens "who have already entered the United States and are subject to 'expulsion'." 357 U.S. at 187, 78 S.Ct. at 1073. See also Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576; Dong Wing Ott v. Shaughnessy, 2 Cir., 1957, 247 F.2d 769, certiorari denied 1958, 357 U.S. 925, 78 S.Ct. 1368, 2 L.Ed.2d 1370.

14. Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 207, 73 S.Ct. 625, 97 L.Ed. 956.

15. Leng May Ma v. Barber, 1958, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246.

16. Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956. See also Kaplan v. Tod, 1925, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585.

agency. Shung already has had two full hearings, the first in 1949 and the second in 1957, when his matter was reopened and new evidence received. In each instance the initial adverse ruling was followed by an administrative appeal, with no change in result. Other than to reiterate his claim, repeatedly rejected, that he is entitled to admission as of right as the blood son of Tom Wing, he advances in this proceeding no other reasons to support his demand for a de novo hearing.

The scope of judicial review is the same whether the challenge to the exclusion order is by way of the ancient writ or, as recently extended, by a declaratory judgment action.[17] Such review under existing law is limited. The procedure authorized by Congress reflects the standard of due process.[18] This is unlike the rule applied in expulsion cases where the alien enjoys a constitutional right to due process—a right which may not be disregarded by Congress in establishing procedures.[19] Thus, in the instant case, judicial inquiry is limited to whether the statutory procedures which govern exclusions have been observed and whether Shung has been accorded a fair hearing thereunder. If so, the administrative determination is conclusive.[20]

Upon the record now before the Court, there is no basis for any charge that the procedural processes authorized by the Congress have not been followed or that petitioner was not accorded a fair hearing by the Boards of Special Inquiry on his asserted immigration status. More-over, the petition herein is devoid of any allegation of fact which impugns the administrative procedures or challenges the fairness of the hearing. Clearly, there is no basis for a hearing de novo.

Shung next contends that before he may be deported to the mainland of China under the exclusion order, there must be affirmative documentation from the Communist Government that it is willing to accept him. No such proof has been presented. The attempt to effectuate the order of exclusion is in accordance with existing procedures of the Immigration Service. Our Government has received advice from the British Crown Colony at Hong Kong that it has granted Shung a 48-hour transit visa for Hong Kong en route to the mainland of China. It is contemplated that he will be taken by British authorities from Hong Kong to the Chinese border and there presented for admission into that country. Should Shung be denied admission, the Government represents that, at its expense, he will be returned to the United States.

The statutory procedures for effecting exclusion are markedly different from those which apply in expulsions. Deportation of an excluded alien is governed by section 237(a) of the Immigration and Nationality Act which simply provides that such an alien "shall be immediately deported to the country whence he came * * *".[21] There is no requirement of consent by, or willingness to receive on the part of, the country whence he came.

17. Brownell v. Tom We Shung, 1956, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225.

18. Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 212, 73 S. Ct. 625, 97 L.Ed. 956; United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317; Nishimura Ekiu v. United States, 1892, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146. Compare United States ex rel. Paktorovics v. Murff, 2 Cir., 1958, 260 F.2d 610.

19. Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 597–598, 73 S.Ct. 472, 97 L. Ed. 576.

20. Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956; United States ex rel. Knauff v. Shaughnessy, 1950, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317; Quon Quon Poy v. Johnson, 1927, 273 U.S. 352, 47 S.Ct. 346, 71 L.Ed. 680; United States v. Ju Toy, 1905, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040.

21. 66 Stat. 201 (1952), 8 U.S.C.A. § 1227 (a).

On the other hand, deportation of an alien in expulsion proceedings, whether he entered the United States legally or illegally, is governed by section 243(a) of the act of 1952.[22] This section contains varied and alternative provisions for the expulsion of an alien. He is given the first choice of designating the country to which he prefers to be deported. If that country refuses to accept him or, if next in order, the country of which the alien is a national or citizen will not accept him, then the Attorney General is given discretionary power to effect deportation to any one of seven alternative countries, without order of priority, subject to the condition that the country shall be willing to accept him.[23]

The very concept of choice in the instance of expulsion proceedings, whether it be by preference of the alien or designation by the Attorney General, makes it desirable that there be acceptance on the part of a country to which deportation is contemplated. No such reason exists in the instance of exclusion under section 237(a) with its single direction that the alien "shall be immediately deported to the country whence he came". Congressional policy contemplates that a nonadmissible alien would be promptly excluded. That this cannot be effected "immediately" because of protracted litigation does not change the alien's status from that of an excludee to that of an expellee so as to entitle him to the benefits of section 243(a) with its condition that the receiving country be willing to accept him.[24]

The very fact that Congress spelled out in section 243(a) the requirement of consent by the receiving country negates any contention that such requirement be read into section 237(a) as a condition to exclusion. To uphold the relator's position would require not only that the Court disregard the omission in section 237(a) of any requirement of willingness to accept the excludee by "the country whence he came", but the addition thereto of a clause, "if that country is willing to accept him". This the Court may not do. This clearly is judicial legislation, not statutory construction.

The relator places great emphasis upon United States ex rel. Tom Man v. Murff,[25] but that was an expulsion proceeding under section 243(a) and the holding was based upon the provisions of that section.

■ Finally, Shung contends that the mainland of China is not "the country whence he came". He concedes that he left there in 1947, arriving at San Francisco via Hong Kong, on his quest for admission to the United States. He urges, however, that since his departure in 1947 the Chinese mainland has become "a completely different country * * *. The entire system of government is different, the entire economic system is different, the entire system of religion and family hierarchy has been abolished, physical persecution is rampant, political freedoms are nonexistent * * *". In short, he states that when he left there it was a democratic country administered by the Government of Chiang Kai Shek, whereas now it is a communist country administered by a communist dictator. In consequence, he contends that Communist China is not the "country whence he came" within the meaning of section 237(a) of the Immigration and Nationality Act of 1952; that his exclusion can only be effected, if at all, to the country recognized by the United States, Nationalist China at the island of Formosa. The substance of his argument is that for a "country" to be equated to the one from "whence he came", its government must be the same politically and ideologically as when he embarked for our shores and that unless it is, he may not be returned there. He further

22. 66 Stat. 212 (1952), 8 U.S.C.A. § 1253(a).

23. United States ex rel. Tom Man v. Murff, 2 Cir., 1959, 264 F.2d 926. See also United States ex rel. Tie Sing Eng

v. Murff, D.C.S.D.N.Y.1958, 165 F.Supp. 633, affirmed 2 Cir., 1959, 266 F.2d 957.

24. Rogers v. Quan, 1958, 357 U.S. 193, 78 S.Ct. 1076, 2 L.Ed.2d 1252.

25. 2 Cir., 1959, 264 F.2d 926.

contends that because Communist China is not recognized by the United States, it is not a "country" within the meaning of section 237(a).

The phrase, "country whence he came", has appeared in exclusion and expulsion provisions of immigration acts for five decades without substantial change.[26] Its antedecents go back to the Immigration Act of 1907.

Historically, the exclusion provision was aimed at those steamship lines which permitted, if not encouraged, aliens they knew to be excludable to book passage to the United States with the prospect of collecting a return fare when they were subsequently denied admission. The sanctions were directed toward the steamship lines and not against the alien.[27] Undoubtedly the prime objective was to keep from our shores aliens who were not admissible under congressional policy. The statute intended the prompt and "immediate" return of such aliens. Indeed the original statute contemplated, where practicable, return on the very "vessels bringing them".[28] The successor and present acts are of similar purport. The congressional purpose was to make certain that transportation lines returned the inadmissible alien to the original territory from which he came and that he was not landed at a nearby territory from which he might attempt to gain unlawful entry into the United States.

Here again, Shung's status as an excludee must be emphasized. The delays which ensued following his efforts to gain admission have not bettered his position.[29] In law he still is "treated as if stopped at the border."[30]

Since the essential purpose of the exclusion statute is to effect with dispatch, where feasible, the return of an excluded alien, our Government is not concerned with the form of government which prevails in the country from which the alien came and to which he is to be returned. The policy of the law is not to be deflected because, with the passage of time while the alien litigates his claim to admission, the basic structure of the government of the country whence he came has been altered. To adopt the relator's construction would make our exclusion statute subject to political shifts in other countries.

We live in an era in which dynamic changes in governments throughout the world have not been unusual. Some changes have been peaceful; others have been violent. Governments have fallen; leaders have fled from their countries; some have regained their power; but whatever the change, the country remains. The United States has recognized some new governments; it has refused to recognize others. In any event, changes in foreign governments, whether peaceful or cataclysmic, do not create immunity for excludable aliens from the provisions of our exclusion laws. Aliens do not thereby gain a right of asylum in our country. Nothing in the sparse legislative history of the exclusion provisions of the various immigration acts warrants the construction that an inadmissible alien can be returned to the country from which he departed for the United States only when its government is ideologically the same as when he left it.

■ The relator here makes general and unsubstantiated charges of his likely

26. Immigration and Nationality Act of 1952, § 237(a), 66 Stat. 201, 8 U.S.C.A. § 1227(a); Immigration Act of 1917, §§ 18, 20, 39 Stat. 887, 890; Immigration Act of 1907, §§ 19, 21, 34 Stat. 904, 905. The phrase was eliminated from the expulsion section by the Subversive Activities Control Act of 1950, § 23, 64 Stat. 1010, which gave the Attorney General various choices in carrying out orders of deportation in expulsion proceedings.

27. United States v. Nord Deutscher Lloyd, 1912, 223 U.S. 512, 32 S.Ct. 244, 56 L. Ed. 531.

28. Immigration Act of 1907, § 19, 34 Stat. 904.

29. Rogers v. Quan, 1958, 357 U.S. 193, 78 S.Ct. 1076, 2 L.Ed.2d 1252.

30. Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 215, 73 S.Ct. 625, 631, 97 L.Ed. 956.

physical persecution if he is returned to Communist China. But whether asylum is to be granted to aliens because they may face persecution in the country to which they are deportable, either as excludees or expellees, is a matter which rests with the Congress. In such cases, it has made relief available to expellees.[31] It has not done so in the instance of excludees. The Courts are not at liberty to supply that which Congress appears deliberately to have omitted from the exclusion statute.

Counsel for the relator places great store upon United States ex rel. Milanovic v. Murff,[32] which he describes as "a nearly identical situation". He stresses in particular its obiter dictum with reference to section 237(a) of the act:

"We think that the statute manifests an intention, when an alien is excluded, that the situation existing before the arrival of the alien in this country be restored so far as is possible. It is enough to say that a return to Yugoslavia, a country from which Milanovic fled 13 years ago and with which he has severed all ties, would not be a restoration of the status quo contemplated by the statute. Hence, Yugoslavia is not the country whence he came."[33]

This dictum bears analysis against the factual background of the case and the Court's holding. The basic issue was one of fact—was Belgium or Yugoslavia the country whence the relator came? The essential facts were not in dispute. Milanovic, a native of Yugoslavia, fled from there in 1945 and crossed the border into Italy where, for about three years, he was in a displaced persons' camp maintained by the British. In 1948 he shipped from Italy as a crewman on a vessel of Italian registry which arrived in New York where he attempted to enter illegally. He was ordered excluded. He then shipped out on a Panamanian vessel which, after several voyages, he left at Antwerp, Belgium, in December 1948. He lived at a seamen's home in Antwerp for forty days but the Belgian Government would not permit him to remain. Thereupon, the shipowner of the vessel on which he last sailed transported him from Belgium back to New York where he arrived in January 1949. Since he was not in possession of a valid immigration visa, the immigration authorities ordered him excluded on February 2, 1949. However, in view of pending action on private bills which had been introduced on his behalf in successive Congresses, he was temporarily paroled into the United States. The bills failed of passage. Milanovic then sought adjustment of his status under section 4 of the Displaced Persons Act[34] and later, under section 6 of the Refugee Relief Act of 1953.[35] Both applications were denied on the ground that he had never entered the United States legally. Finally, in August 1956, almost eight years after he had arrived here from Belgium, the Government attempted to execute the exclusion order. There was never any question but that Belgium was the "country whence he came". Indeed, the Immigration Service recognized this and sought to effect his return there. Belgium, however, refused to accept him. Thereupon, the Service communicated with the Yugoslavian Government and obtained its consent to accept Milanovic. As the Trial Court's opinion indicated, the Immigration Service contended that "since Belgium will not accept him, for want of a more appropriate nation, Yugoslavia, as his place of origin and last established residence and as the home of his mother, is tantamount to such a country".

Thus, the immigration authorities, in their effort to execute the exclusion or-

---

31. Immigration and Nationality Act of 1952, § 243(h), 66 Stat. 214, 8 U.S.C.A. § 1253(h).

32. 2 Cir., 1958, 253 F.2d 941.

33. Id. at 943.

34. 62 Stat. 1011 (1948) [later amended by 64 Stat. 224 (1950), 66 Stat. 277 (1952), 50 U.S.C.A.Appendix, § 1953].

35. 67 Stat. 403 (1953) [later amended by 68 Stat. 1044 (1954), 50 U.S.C.A.Appendix, § 1971d].

der, shifted from the specific procedure mandated by the Congress under the exclusion statute and resorted to the provisions of the expulsion statute. In so doing, they disregarded the clear and sharply delineated distinction between the differing procedures and remedies. Milanovic, when he came to the United States in January 1949 from Belgium, had not been in Yugoslavia for more than four years; he had had no contact with it since he had fled from there in 1945. The Trial Judge's finding that Belgium was the "country whence he came" was beyond dispute. The Court of Appeals upheld the finding of fact. Actually, the Court's holding is that in an exclusion proceeding, if the country whence the alien came refuses to accept him, the Government may not resort to the alternative provisions of the expulsion statute. This, of course, is consistent with the Supreme Court holdings that an excludable alien may not obtain the benefits of the expulsion statute.[36] Clearly, the obiter dictum does not support the relator's position here.

▮ Petitioner's further contention that because Communist China is not recognized by the United States it is not a "country" is effectively answered by United States ex rel. Leong Choy Moon v. Shaughnessy,[37] which, while it construed the word "country" appearing in the expulsion section, disposed of the very contention made by the relator here. In the Moon case a resident alien was ordered deported to the mainland of China pursuant to the expulsion provisions of the act, section 243(a). His application for a stay on the ground that he would be subjected to physical persecution was denied. Among other matters, he advanced substantially the same contention as the relator in this case, urging that he could not be deported to Communist China—that "country" under the expulsion section of the act means "a territory under the control of a government recognized by the United States and thus, in this instance, deportation to China means deportation to Formosa or other territories under the control of the Republic of China * * *."[38] Then Circuit Judge Harlan rejected this contention, stating:

> "We cannot agree that the word 'country' in § 243(a) must be so limited. While it is true that parts of the statute contemplate communication with other countries, that is a far cry from saying that if communication is impossible, the other nation is not to be regarded as a 'country'. Such an interpretation would be an unnecessary departure from the ordinary meaning of the term." [39]

While it is true that the Court found added support for its conclusion in subdivision (7) of section 243(a) with its reference to "any of the foregoing *places or countries*" (emphasis supplied), this does not detract from the force of the Court's holding as to the interpretation of "country".

In United States ex rel. Mensevich v. Tod,[40] the Supreme Court defined "country" in the phrase "country whence they came" appearing in section 20 of the act of 1917 "to designate, in general terms, the state which, at the time of deportation, includes the *place* from which the alien came".[41] Significantly, while the phrase construed appeared in the expulsion provision, the exclusion provision contained (except for the word "respectively") identical language.[42]

---

36. Leng May Ma v. Barber, 1958, 357 U.S. 185, 78 S.Ct. 1072, 2 L.Ed.2d 1246; Rogers v. Quan, 1958, 357 U.S. 193, 78 S.Ct. 1076, 2 L.Ed.2d 1252.

37. 2 Cir., 1954, 218 F.2d 316

38. Id. at 318.

39. Id. at 319.

40. 1924, 264 U.S. 134, 44 S.Ct. 282, 68 L. Ed. 591.

41. 264 U.S. at 136, 44 S.Ct. at 283. Emphasis supplied.

42. Immigration Act of 1917, § 18, 39 Stat. 887: "That all aliens brought to this country in violation of law shall be immediately sent back * * * to the country whence they respectively came * * *."

Upon all the foregoing, I am satisfied that the phrase, "country whence he came," in section 237(a) of the act of 1952 refers to the geographical area from which the alien came without regard to the particular government in control of the area at the time of exclusion.

The writ is dismissed.