Esterya **MENON** and **Ruby Rebecca Menon**, an infant under the age of 14 years, by her mother, Esterya Menon, Relators-Appellees,

v.

**P. A. ESPERDY**, as District Director of the Immigration & Naturalization Service, Respondent-Appellant.

No. 152, Docket 32694.

United States Court of Appeals Second Circuit.

Argued Oct. 31, 1968.

Decided June 30, 1969.

Esterya Menon, New York City, pro se, Edith Lowenstein, New York City (Robert Pincus, New York City, on the brief) by appointment of the Court, for relators-appellees.

Francis J. Lyons, Special Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York and Daniel Riesel, Special Asst.

U. S. Atty., on the brief), for respondent-appellant.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

Relators Esterya Menon and her minor daughter, Ruby Rebecca Menon, were ordered excluded from the United States by the Board of Immigration Appeals on July 13, 1965. Subsequently they received notice from the Immigration and Naturalization Service to report for deportation to Turkey. Relators challenged their exclusion order by bringing a declaratory judgment action in the district court, which properly treated the action as a habeas corpus application under 8 U.S.C. § 1105a(b) (Supp.1969). Judge Cooper's decision and order, filed November 15, 1965, held that the exclusion order was valid, but also ruled that the Menons could not be deported to Turkey since it was not the country "whence [they] came" under § 237(a) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a) (1964). Although both the Menons and the government appealed, the Menons later moved to withdraw their appeal on August 1, 1968, which motion was granted.

We affirm the order of the district court in all respects, and hold that the Menons may be deported only to Switzerland under § 237(a).

Section 237(a) provides a deceptively simple formula for determining the country to which aliens may be deported after they have been found excludable from the United States:

"Any alien * * * arriving in the United States who is excluded under this chapter, shall be immediately deported to the country whence he came, in accommodations of the same class in which he arrived, on the vessel or aircraft bringing him, unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper."

Obviously the statute's goal of immediate deportation has not been achieved in this case, despite the absence of any determination by the Attorney General that it is not practicable or proper. Instead, the factual and procedural status of the Menons' case has grown increasingly complex over the course of three years of litigation. It is necessary to review this background in some detail before we can understand how the intent of § 237(a) has been so frustrated, and before we can address the underlying issue of the manner in which the courts should construe the statute.

Mrs. Menon has led a life of international scope, as is indicated by the fact that she speaks seven languages. The record reveals that she was born in Istanbul, Turkey, in 1926, and she is still a Turkish citizen. In 1949 Mrs. Menon moved to Israel; she is of the Jewish faith. While in Israel she met her future husband, V. P. Menon, a national of India employed by the United Nations. Mr. Menon was assigned to Geneva, Switzerland in 1953, and he sponsored the travel of his prospective bride to that city in March of the same year. The Menons were married in Geneva on July 16, 1953. The Menons have not lived together since 1956, but it appears, although the record is not entirely clear on this point, that their marriage is still valid and that no legally effective separation agreement or divorce decree has been obtained.

In 1956 Mr. Menon was transferred to Seoul, Korea, and did not take his wife with him. Their daughter, Ruby Rebecca, born in Geneva July 6, 1956, is a Turkish citizen by virtue of her mother's citizenship.

Mr. Menon was stationed in New York between 1960 and 1962, and during this period Mrs. Menon formed the intention of coming to this country. The record contains a letter to her from Mr. Menon dated December 11, 1961 rejecting her request to come to this country as his dependent, and also stating his desire for a divorce. But Mrs. Menon successfully obtained from the United States consulate

in Geneva, on December 8, 1961, a non-immigrant visitor-for-pleasure visa (a "B–2" visa) good for applications for admission to this country until December 8, 1965. The visa has on it the notation "visit relatives," and Mrs. Menon did indeed visit a relative in Detroit while present in this country. Her primary purpose, however, may have been to gain *in personam* jurisdiction over Mr. Menon in order to sue him for support. She has achieved a certain degree of success in this effort through the New York courts. Although the present status of this litigation is not apparent, at some point Mrs. Menon obtained a court order requiring the payment of $45 a week by her husband, an amount which was deducted by the United Nations from his paycheck and used to finance Ruby's education.

It seems clear that at the time of her application for a visa to this country Mrs. Menon and her daughter were residents of Geneva, living in an apartment still in Mr. Menon's name. The consular officials in Geneva must have believed that Mrs. Menon, upon the conclusion of her visit to the United States, would return to Switzerland, for an alien may not be admitted to this country as a nonimmigrant visitor for pleasure unless he has "a residence in a foreign country which he has no intention of abandoning * * *." 8 U.S.C. § 1101(a) (15) (B). Mrs. Menon did return to her Geneva apartment for one month, in July, 1963, during one of her several temporary absences from the United States which were followed by her readmission to this country as a visitor for pleasure. However, since that date Mr. Menon has sold the apartment, leaving the relators without an established residence anywhere in the world outside of this country. Mrs. Menon does own furniture insured for $10,000 whch is being held in Switzerland for her.

The Menons were first admitted into this country as visitors for pleasure on January 2, 1962, for a period of four months. Thereafter, on eight different occasions, the Menons departed from this country for periods of time ranging from one day to six months, following which they gained readmission to the country under their renewed B–2 visas. All of these trips outside the United States were to Canada, with the exception of the one-month visit to Switzerland in 1963.

On July 25, 1964 the Menons departed from the United States for the ninth time since their original admission in 1962. They stayed in Canada for only two hours, and then sought readmission at the border. On this occasion, either on their own initiative or at the urging of the customs officials, the Menons requested admission not as visitors for pleasure but rather as dependents of a United Nations employee, pursuant to 8 U.S.C. § 1101(a) (15) (G) (iv) (hereinafter referred to as G–4 status). They were paroled into this country pending a determination of their G–4 application, and have remained in that status to this date. Since a parole does not constitute an admission into the United States, Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925), the question on this appeal involves an exclusion under § 237(a) of the Act, 8 U.S.C. § 1227(a) rather than an expulsion under § 243(a), 8 U.S.C. § 1253(a). The provisions of these sections with respect to the place of deportation differ in important respects, as will be noted.

In September and October of 1964 a hearing pursuant to exclusion proceedings was held before a Special Inquiry Officer. 8 U.S.C. § 1226. The Menons appeared with counsel, Jules Coven, Esq., who was appointed by the Officer and served without fee. The Officer's oral decision on October 16, 1964 found the Menons excludable on three grounds: 1) They were likely to become public charges, 8 U.S.C. § 1182(a) (15); 2) They were persons not in possession of the appropriate valid nonimmigrant visas, 8 U.S.C. § 212(a) (26); 3) They are immigrants, because of their intention to stay in the United States for an indefinite period of time, not in possession of the required valid immigrant visas, 8 U.S.C. § 1182(a) (20). The Officer

also held that since the United Nations had not granted the Menons G–4 status they could not gain admission as United Nations dependents.

On April 6, 1965, the Board of Immigration Appeals sustained an appeal by the Menons from this decision, finding that they did not intend to stay in this country for an indefinite period. The Board directed that the Menons be admitted as nonimmigrant visitors for pleasure for a period of three months, but under such conditions as the field office of the Immigration and Naturalization Service might wish to impose, including the exaction of a bond. The office, acting under the authority of 8 U.S.C. § 1252(a), required that the Menons post a $500 bond as security for their departure at the expiration of their three-month visa.

Mrs. Menon was unable to post the required bond, and consequently her case was certified back to the Board of Immigration Appeals. After hearing oral argument by Mrs. Menon, who at her own request, appeared without counsel, the Board on July 13, 1965 withdrew its earlier order and affirmed the Special Inquiry Officer's order of October 16, 1964, excluding the Menons. The Board specifically found that the Menons were not entitled to G–4 status, but did not state any reasons for this conclusion.

Neither the Special Inquiry Officer nor the Board in its decision explicitly addressed the question of the place of deportation. This determination was made by the Service, and on October 12, 1965, the Menons received notice to report on October 27 for deportation to Turkey. However, on receipt of this notice Mrs. Menon, who judging from the record is a very determined woman, headed not for the Hudson River piers but for the United States Courthouse.

On October 25, 1965, Mrs. Menon filed suit for a declaratory judgment in the Southern District. The complaint alleged that the action of the Immigration Service in denying the Menons admission to the country was in violation of procedural due process and an abuse of the Service's statutory discretion. On the point now before us Mrs. Menon challenged the right of the Service to order her deportation to Turkey without holding a deportation hearing and affording her an opportunity to demonstrate that Turkey was not the appropriate place of deportation. The relief prayed for was a temporary restraining order and a declaration that deportation was illegal until a full hearing was held. Cf. United States ex rel. Di Paola v. Reimer, 102 F.2d 40 (2d Cir. 1939).

While the complaint was not characterized as an attack on the exclusion order, it certainly was so in fact. Under 8 U.S.C.A. § 1105a(b) (Supp.1969) the sole procedure for challenging an order of exclusion is by an application for a writ of habeas corpus. For this reason on October 25 Judge MacMahon denied the application for an order to show cause and a temporary restraining order. But the following day he treated the papers as an application for a writ of habeas corpus and allowed the writ. *See* Gordon & Rosenfield, Immigration Law and Procedure § 8.8, at p. 8–41 (1967); Application of Argyros, 245 F.Supp. 190, 191 (S.D.N.Y.1965).

Return of the writ was made on November 3. At the hearing before Judge Cooper attorney Coven appeared and made an argument against the designation of Turkey as the country of deportation. The government informs us that Mrs. Menon did not agree with this strategy and instead urged the invalidity of the exclusion order itself. As a formal matter attorney Coven participated, apparently, as a friend of the court rather than as Mrs. Menon's counsel.

Judge Cooper's opinion, 248 F.Supp. 261, 265 (S.D.N.Y.1965), holds that the Menons are not entitled to G–4 status since the United Nations rejected her claim to that status. The court also found the exclusion order valid. But it held that Switzerland and not Turkey was the country to which the Menons must be deported under § 237(a), since thereby "the situation existing before

the arrival of the alien[s] in this country [would] be restored so far as is possible." United States ex rel. Milanovic v. Murff, 253 F.2d 941, 943 (2d Cir. 1958).

Both sides noticed appeals from Judge Cooper's decision, Mrs. Menon on November 17 from the portions of the decision upholding the exclusion order and denying her claim for a G–4 visa, and the government, on January 11, 1966, from the court's decision that the Menons could not be deported to Turkey. In addition, Mrs. Menon had noticed on October 27, 1965, an appeal from Judge MacMahon's order of October 25 denying her motion for an order to show cause and a temporary restraining order. The two appeals of Mrs. Menon were consolidated by our order of June 17, 1966. On January 3, 1966, we granted the Menons' motion to proceed in forma pauperis, but denied their request for appointed counsel without comment.

It should be noted that when we denied the Menons' motion for the appointment of counsel we had only the Menons' appeal before us. Apparently the panel hearing the motion concluded that the issues raised in that appeal were insubstantial. But with the government's notice of appeal eight days later the clearly substantial issue of the country of deportation was raised, a fact which ultimately has led us to appoint counsel for the Menons despite our original denial of their motion for that relief. Their need for counsel also has been demonstrated by the following intervening events.

The District Director waited until June 10, 1968, two years after filing his notice of appeal, before requesting this court to set a briefing schedule, alleging that the parties themselves had been unable to do so. A schedule was set by the court, with Mrs. Menon's brief being due on August 1, failing which her appeal was to be dismissed. On July 26, however, Mrs. Menon moved to withdraw her appeal on the ground that she had pending in the district court a declaratory judgment action the determination of which "will ultimately be dispositive of the issues involved in this appeal." In fact this supposition was in error for the declaratory judgment action was not pending in the district court. As noted above, it had been properly treated by Judges MacMahon and Cooper as an application for a writ of habeas corpus, the denial of which was the subject of Mrs. Menon's appeal. Thus by withdrawing her appeal Mrs. Menon was depriving herself of the right to further contest the validity of the exclusion order and her claim to a G–4 visa, a fact pointed out by the government in its opposing affidavit of July 31, 1968. We granted the motion to withdraw on August 1.

Mrs. Menon has been confused on this point throughout the course of the government's appeal. She filed no brief in opposition to the District Director's brief. Instead, she filed a motion to dismiss the government's appeal, alleging inter alia that it had become moot because she was no longer in possession of a valid Turkish passport; her possession of the passport had been one of the reasons advanced by the government to justify the proposed deportation to Turkey. This argument of Mrs. Menon is clearly insufficient to justify a dismissal of the government's appeal, although we have considered its possible effect on the merit of that appeal. But the main thrust of Mrs. Menon's motion to dismiss is that she is entitled to a default judgment in her district court action because of the government's refusal to answer her original complaint for declaratory relief. Once again she proceeds on the mistaken assumption that her action for declaratory relief is still alive. We therefore denied the motion to dismiss on December 19, 1968.

The result of all this was that on the original hearing of the government's appeal we had no brief from Mrs. Menon concerning the only question properly before us, i. e., whether Turkey or Switzerland is the appropriate objective of deportation. We did have an extensive affidavit and argument filed by Mrs. Menon in the district court in connection with her motion for default judgment,

but it is concerned solely with her claim for a G–4 visa. We heard counsel for the District Director in the absence of Mrs. Menon, who had telephoned that she was ill, but the government's able argument further indicated the closely balanced nature of the § 237(a) issue.

Since Mrs. Menon obviously was confused concerning the procedural status of her litigation, and because we felt the need for a brief answering the government's position concerning § 237(a), subsequent to hearing the government's oral argument we appointed Edith Lowenstein as counsel for Mrs. Menon, see Cunningham v. Erie R. R. Co., 266 F.2d 411, 413 (2d Cir. 1959), and her excellent brief has been of great aid to this court in resolving the § 237(a) issue. In our order of appointment we encouraged counsel Lowenstein to move to vacate the dismissal of the Menons' appeal if she found that it presented any non-frivolous issue, but she concluded that that appeal raised no non-frivolous issues.

Mrs. Menon, who was unable to cooperate with the two lawyers who assisted her without fee on different occasions prior to this appeal, also finds herself in disagreement with the Lowenstein brief. She has in fact moved to strike the brief in its entirety, apparently because Mrs. Menon is disinterested in the § 237(a) issue and instead wishes to press her claim to G–4 status as a United Nations dependent.

We of course deny the motion to strike the brief of appointed counsel. In the circumstances of this case appointed counsel is aiding the court in attempting to reach a correct resolution to a generally applicable point of law, as much as counsel is aiding Mrs. Menon. Therefore we avail ourselves of counsel's able brief, while recognizing that the Menons are not bound by its recital of facts or legal contentions.

Mrs. Menon still insists that she has a declaratory judgment action raising the G–4 question pending in the district court. Since, for reasons noted previously, she does not, out of an abundance of caution we will examine her claim to G–4 status in connection with this appeal.

### Claim to United Nations Dependent Status

The Menons base their claim for admission on 8 U.S.C.A. § 1101(a) (15) (G) (iv). In accordance with the International Organizations Immunities Act, § 8(a) (3), 59 Stat. 669 (1945), this section provides for the admission as nonimmigrants of "officers, or employees" of certain international organizations, of which the United Nations is one, "and the members of their immediate families." The Menons claim they are the wife and daughter respectively of Mr. V. P. Menon, who is employed by the United Nations Secretariat in New York, and that therefore they are entitled to G–4 visas as long as Mr. Menon retains his United Nations employment.

The Menons have unsuccessfully sought a G–4 visa on several occasions from immigration officials and from the United Nations. In essence it appears that the Immigration Service has refused to issue the visa because the United Nations has not requested that it do so or indicated that it believes the Menons are entitled to G–4 status. The United Nations, it may be inferred from the record, has acted unfavorably on the Menons' requests because of the wishes of Mr. V. P. Menon.

It is proper for the United States to refuse to issue a G–4 visa unless and until requested to do so by the international organization involved. The purpose of the G–4 and related visa categories is to facilitate the operations of international organizations in this country. If such an organization concludes that the grant of a given G–4 visa is not needed to facilitate its operations then there is no reason for this court to require the United States to grant such status. The sensible interpretation of the G–4 provision is that it does not confer the right to a visa by its own terms, but rather only provides a basis for the issuance of a visa upon a request or certification by

the appropriate international organization.

■ Moreover, the Menons are not within the classification "immediate family" contemplated by the statute in question. The regulations give this definition of the phrase:

"[C]lose relatives who are members of the immediate family by blood, marriage, or adoption, who are not members of some other household, *and who will reside regularly in the household of the principal alien.*" 22 C.F.R. § 41.1 (emphasis added).

There is a dispute lurking in the record whether Mrs. Menon is separated or divorced from her husband, but for present purposes we accept her contention that a legal and valid marriage still exists. Nonetheless, it is clear that Mrs. Menon has not lived with her husband since 1956, and that there is no prospect that she will do so in the future. Indeed Mrs. Menon's principal activity in this country has been the prosecution of an action for support against her husband in the New York courts. We note in addition that Mr. Menon has not been stationed in this country since 1963. Thus, it cannot be said that Mrs. Menon would "reside regularly" in her husband's household.

The regulation is a reasonable explication of the statutory purpose of facilitating the functioning of recognized international organizations in this country. This purpose will not be furthered by the admission of an estranged wife of an employee of the organization who himself is not stationed in the United States.

Mrs. Menon appears to request in the alternative that this case be remanded to the district court for a full hearing on her G–4 claim. But we see no disputed factual issue respecting which a resolution favorable to the Menons would entitle them to the relief they seek. The decision of Judge Cooper upholding the validity of the order of exclusion is affirmed.

*Country of Deportation under § 237(a)*

At the outset, § 237(a), providing for the deportation of aliens who are excluded from this country to the "country whence [they] came," must be distinguished from § 243(a), 8 U.S.C.A. § 1253, which deals with the deportation of aliens expelled from the country subsequent to their admission. Under § 243 (a) the alien is allowed to designate the country to which he wishes to be deported, and this designation binds the government unless the country selected is not willing to admit the alien, or the Attorney General concludes that deportation to that country would be prejudicial to the interests of the United States. If either of these two exceptions is invoked, or if the alien declines to designate a country, then the statute contemplates deportation to any country of which the alien is a "subject[,] national, or citizen," if such country is willing to accept him. If not, the Attorney General is given broad discretion to order deportation. He may select the country of birth, the country in which the alien last resided before coming to the United States, the country from which the alien entered the United States, or the country from which the alien embarked either for this country, or for a foreign contiguous territory. Finally, if deportation to any of these countries is "impracticable, inadvisable, or impossible," then deportation may be ordered "to any country which is willing to accept such alien into its territory." 8 U.S.C.A. § 1253(a) (7).

■ Section 243(a) thus provides for a series of alternative countries to which the alien may be deported, ultimately extending to any country in the world willing to accept the alien. But § 237(a), involved in this case, by contrast provides for deportation only "to the country whence [the alien] came." There can be only one country—"the country" in the words of the statute—which corresponds to the § 237(a) definition under a given set of circumstances. See United States ex rel. Tom We Shung v. Murff, 176 F.Supp. 253, 257–258, 261 (S.D.N.Y. 1959), aff'd United States ex rel. We Shung v. Esperdy, 274 F.2d 667 (2d Cir. 1960) (per curiam).

The test for determining the country "whence [the alien] came" was stated in United States v. Holland-American Line, 231 F.2d 373 (2d Cir. 1956), as follows:

"[T]he country from whence an alien comes is that country in which the alien has a place of abode and which he leaves with the intention of coming ultimately to this country." 231 F.2d at 376.

A literal application of *Holland-American* to this case might result in the Menons being "deported" to the United States. They were excluded at the border on June 25, 1964, following a two hour visit to Canada, prior to which they had lived in this country for six months without interruption. It is clear that in departing for Canada on June 25 the Menons intended only to stay briefly and then return to the United States, where they maintained their place of abode. Thus looking only at the situation at the time of the actual exclusion of the Menons, the United States was that country in which they had a place of abode and which they left "with the intention of coming ultimately to this country." See Stacher v. Rosenberg, 216 F.Supp. 511 (S.D.Cal.1963).

But this result, clearly at odds with the purposes of the immigration laws, is not required in this case. In *Stacher* the district court was faced with an extreme set of circumstances. An alien who had lived in this country for nearly 50 years was excluded after returning from a brief visit to Europe. Because the alien had not established an abode outside the United States since emigration from Russia in 1912 the court, applying the *Holland-American* test, had no alternative but to conclude that the United States was the country of deportation under § 237(a), noting that the government had treated as an instance of exclusion what in reality was an attempt to expel a permanent alien resident of this country. 216 F.Supp. at 514.

■ Here the Menons never achieved permanent resident status. Their several successive readmissions to this country were all pursuant to their temporary visitors-for-pleasure visa issued in 1961. All of these later admissions represent only a renewal of the Menons' original intention to come to this country, an intention formed in 1961 and first achieved in 1962. In the circumstances of this case, then it is logical to regard 1962 as the year in which the Menons "came" to this country, and therefore to apply § 237 (a) and *Holland-American* with reference to the circumstances surrounding the Menons' original admission to the United States in that year.

Once 1962 is fixed as a reference point it is difficult to avoid the conclusion that Judge Cooper was correct in determining that Switzerland, and not Turkey, was the appropriate country of deportation. It is beyond dispute that the Menons maintained an abode and resided in fact in Switzerland from 1953 until their first admission into the United States, and that it was from Switzerland that they left "with the intention of coming ultimately to this country." United States v. Holland-American Line, 231 F.2d 373, 376 (2d Cir. 1956).

■ The government in effect asks us to abandon the *Holland-American* test in exclusion cases, and instead adopt a more flexible approach, since "every case depends on its own facts." United States ex rel. Karamian v. Curran, 16 F.2d 958, 961 (2d Cir. 1927). In attempting to support deportation to Turkey, it relies on the Menons' possession of a Turkish passport at the various times they gained admission to this country. It also points out that Mrs. Menon was born in Turkey, apparently still has some relatives living there, and finally on one occasion sought the aid of the Turkish Consulate in New York concerning her immigration problems. These facts, we are told, establish a sufficient connection between the Menons and Turkey to support the deportation order. The government's brief also states that Mrs. Menon has never objected to returning to Turkey. In fact she has made clear her opposition to this course, Special Inquiry Hearing, Oct. 16, 1964, at p. 52, but in any event the de-

sires of an alien are not relevant to a § 237(a) determination given the mandatory statutory language.

Even if we were to accept the government's flexible approach to § 237(a) it is far from clear that deportation to Turkey would be proper. While the Menons are citizens of Turkey, Mrs. Menon has not been in that country since 1949 and her daughter, born in Switzerland, has never been to Turkey. On several occasions this court has refused to approve the deportation of aliens to countries from which they had been absent for periods considerably shorter than Mrs. Menon's absence from Turkey. See, e. g., United States ex rel. Mazur v. Comm'r of Immigration, 101 F.2d 707 (2d Cir. 1939) (11 year absence); United States ex rel. Milanovic v. Murff, 253 F.2d 941, 943 (2d Cir. 1958) (13 year absence). We are aware of no case sustaining the deportation of an excluded alien to a country he has never been in, which would be the result here were Ruby deported to Turkey. It can hardly be said that deportation of these aliens to Turkey will restore "so far as possible" "the situation existing before the arrival of the alien[s] in this country." United States ex rel. Milanovic v. Murff, *supra*, 253 F.2d at 943. Finally, while the Menons did need their Turkish passport to gain admission into this country, they also needed their B–2 visa, which was issued upon a finding that they maintained a residence in Switzerland which they had "no intention of abandoning * * *." 8 U.S.C.A. § 1101(a) (15) (B). Thus if the government's argument is based on estoppel, no reason appears why the estoppel does not relate just as strongly to Switzerland as to Turkey.

But our principal disagreement with the government's position concerns its basic contention that this court is free to ignore the specific and mandatory language of § 237(a) and adopt instead an interpretation of the section which would resemble the statutory scheme under § 243(a) governing instances of expulsion. We gather from oral argument that the government fears it will be unable to deport the Menons to Switzerland because of that country's refusal to accept them. In this circumstance, which in any event is not supported by the record, we are asked to look back in Mrs. Menon's lifetime and find the country with which she has the closest relationship other than Switzerland. Presumably if Turkey rejected the Menons we might be asked to consider the permissibility of deportation to Israel, and so on. The ultimate approach might be to examine the life history of an alien backward in time, like peeling the layers off an onion, until a country were found willing to accept the alien.

Such an approach to the problem of deporting excluded aliens might be desirable, and indeed is analogous to the scheme provided by § 243(a) for the deportation of expelled aliens. It would eliminate the danger which exists under § 237(a) as presently construed whereby the one "country whence the alien came" will refuse to accept the alien, and thus frustrate the attempt of the Immigration Service to deport persons clearly not entitled to admission into this country. E.g., United States ex rel. Mezei v. Shaughnessy, 195 F.2d 964 (2d Cir. 1952), rev'd, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953).

But while the approach suggested by the government has merit, is is not the one enacted by Congress. Instead, we are confronted with an anachronistic relic which in its operative language dates back at least as far as the 1882 Chinese Exclusion Act. See United States v. Chong Sam, 47 F. 878 (E.D.Mich.1891). The purpose of Congress in this and succeeding immigration laws dealing with excluded aliens was to insure that transportation lines would not profit from the practice of booking passage to the United States by aliens the lines knew would be excluded, and then collecting a return fare when the aliens were indeed refused admission. United States ex rel. Tom We Shung v. Murff, 176 F.Supp. 253, 259 (S.D.N.Y.1959). Congress provided for the "immediate" deportation of each alien

on the vessel which brought him to the "country whence he came," that is, the country in which he boarded the vessel or aircraft which brought him to this country. The line is responsible for the cost of deportation unless the alien was in possession of valid immigrant or non-immigrant papers, thus giving the line no reason to suspect that the alien would be excluded. This is the case with the Menons, for on each of their journeys to this country they possessed a valid B–2 non-immigrant visa.

In a case such as this the above scheme, now embodied in § 237(a), is inappropriate. "Immediate" deportation is not possible because of the avenues of judicial review of exclusion orders which an alien may pursue. During the time occupied by litigation many events can transpire resulting in the inadmissibility of the alien in the country "whence he came." Here, for example, the government suggests that Mrs. Menon has lost her contact with Switzerland since Mr. Menon is no longer stationed in that country with the United Nations, although we note that this was the situation for some five years prior to the Menons' first trip to the United States, and apparently they had no difficulty in maintaining their Swiss residency during this period.

Despite its evident shortcomings we must apply § 237(a) as written until Congress sees fit to change the statute. Indeed, an attempt to modify the section through case-by-case adjudication would only compound the problems arising from the present wording. At least in the vast majority of the cases the country of deportation now can be clearly identified under the interpretation of § 237(a) reflected in the *Holland-American* test. Under a more flexible reading of the section, one centering on the goal of finding a country to which deportation is possible, litigation likely would become more frequent in exclusion cases. There would be no uniform test under the section to enable aliens to foresee in most instances the futility of litigation, and this uncertainty would encourage more challenges to immigration orders.

We, therefore, adhere to the *Holland-American* interpretation of the "country whence he came" language in § 237(a). Under this interpretation it is irrelevant whether or not Switzerland will admit the Menons upon their deportation from this country for § 237(a), unlike § 243(a), does not require the consent of the country to which deportation is ordered. See United States ex rel. Tom We Shung v. Murff, 176 F.Supp. 253, 257–258 (S.D.N.Y.1959), aff'd United States ex rel. We Shung v. Esperdy, 274 F.2d 667 (2d Cir. 1960) (per curiam). This being so, the application of § 237(a) results in the deportation of the Menons being proper only to Switzerland: there they last maintained a place of abode outside of the United States, and there they formed the intention of coming to this country.

We cannot go beyond this standard in a search for other possible countries to which the Menons could be deported, because Congress has not given us this option. The distinction between the singular "the country" to which deportation is proper under § 237(a), and the variety of alternative countries to which deportation may be proper under § 243(a), could not be clearer. However unwise the restricted standard of § 237(a) may be we must apply its terms as long as they stand. See United States ex rel. Milanovic v. Murff, 253 F.2d 941, 944 (2d Cir. 1958). The government, having chosen to proceed against the Menons under the laws relating to exclusion, may not in this proceeding shift to the statutes dealing with expulsion for the purposes of securing deportation. United States ex rel. Tom We Shung v. Murff, 176 F.Supp. 253, 260–261 (S.D.N.Y.1959), aff'd United States ex rel. We Shung v. Esperdy, 274 F.2d 667 (2d Cir. 1960) (per curiam).

The writ of habeas corpus will not issue for the present, since the government under the order of exclusion may seek lawfully to deport the Menons to Switzerland. If the government does not succeed in this attempt within ninety days we direct that the writ shall issue.

See United State ex rel. Milanovic v. Murff, 253 F.2d 941, 942 (2d Cir. 1958).

Counsel Edith Lowenstein has the thanks of the court for her valuable assistance, rendered without compensation, on this appeal.