## KWONG HAI CHEW *v.* COLDING ET AL.

No. 17.   Argued October 17, 1952.—Decided February 9, 1953.

*Carl S. Stern* argued the cause for petitioner. With him on the brief was *Blanch Freeman*.

*John F. Davis* argued the cause for respondents. With him on a brief for Shaughnessy, respondent, were *Acting Solicitor General Stern, Assistant Attorney General Murray, Beatrice Rosenberg* and *Murry Lee Randall*.

MR. JUSTICE BURTON delivered the opinion of the Court.

A preliminary consideration that is helpful to the solution of this litigation is whether, under 8 CFR § 175.57 (b),[1] the Attorney General has authority to deny to a lawful permanent resident of the United States,

---

[1] "§ 175.57    *Entry not permitted in special cases.* . . .

"(b) In the case of an alien temporarily excluded by an official of the Department of Justice on the ground that he is, or may be excludable under one or more of the categories set forth in § 175.53, no hearing by a board of special inquiry shall be held until after the case is reported to the Attorney General and such a hearing is directed by the Attorney General or his representative.    In any special case the alien may be denied a hearing before a board of special inquiry and an appeal from the decision of that board if the Attorney General determines that he is excludable under one of the categories set forth in § 175.53 on the basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest."

The categories set forth in § 175.53 as a basis for exclusion are those defined "to be prejudicial to the public interest."    They include, for example, membership in "a political organization associated with or carrying out policies of any foreign government opposed to the measures adopted by the Government of the United States in the public interest . . ." or being "engaged in organizing, teaching, advo-

who is an alien continuously residing and physically present therein, the opportunity to be heard in opposition to an order for his "permanent exclusion" and consequent deportation, provided the Attorney General determines that the order is based on information of a confidential nature, the disclosure of which would be prejudicial to the public interest. Assuming, as seems to be clear, that the Attorney General does not have such authority, the critical issue then presented is whether he has that authority under the following additional circumstances: the resident alien is a seaman, he currently maintains his residence in the United States and usually is physically present there, however, he is returning from a voyage as a seaman on a vessel of American registry with its home port in the United States, that voyage has included scheduled calls at foreign ports in the Far East, and he is detained on board by order of the Attorney General. For the reasons hereafter stated, we hold that these additional circumstances do not change the result and that the Attorney General does not have the authority suggested.

Petitioner, Kwong Hai Chew, is a Chinese seaman last admitted to the United States in 1945. Thereafter, he married a native American and bought the home in which they reside in New York. Having proved his good moral character for the preceding five years, petitioner secured suspension of his deportation. In 1949, he was admitted to permanent residence in the United

cating, or directing any rebellion, insurrection, or violent uprising against the United States." 8 CFR.

For statutory language similar to that in 8 CFR § 175.57, see § 5 of the Act of October 16, 1918, as amended by the Subversive Activities Control Act of 1950, 64 Stat. 1008, 8 U. S. C. (Supp. V) § 137–4, referring to aliens who are "excludable" under § 137. The Government, in the instant case, relies upon 8 CFR § 175.57, rather than upon 8 U. S. C. (Supp. V) § 137–4.

States as of January 10, 1945.[2]  In World War II, he served with credit in the United States Merchant Marine. He never has had any difficulty with governmental authorities.  In April, 1950, he filed a petition for natural-

---

[2] *"Resolved by the Senate (the House of Representatives concurring),* That the Congress favors the suspension of deportation in the case of each alien hereinafter named, in which case the Attorney General has suspended deportation for more than six months.

.        .        .        .        .

"A-6665545, Chew, Kwong Hai, or Harry Kwong (Hai Chew).

.        .        .        .        .

"Agreed to July 20, 1949."   63 Stat. 1240, 1242.

For the effect of the above action, see § 19 (c) of the Immigration Act of February 5, 1917, as amended, 62 Stat. 1206, 8 U. S. C. (Supp. V) § 155 (c):

"(c) In the case of any alien . . . who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the Attorney General may . . . suspend deportation of such alien if he is not ineligible for naturalization or if ineligible, such ineligibility is solely by reason of his race, if he finds (a) that such deportation would result in serious economic detriment to a citizen or legally resident alien who is the spouse, parent, or minor child of such deportable alien; or (b) that such alien has resided continuously in the United States for seven years or more and is residing in the United States upon the effective date of this Act. If the deportation of any alien is suspended under the provisions of this subsection for more than six months, a complete and detailed statement of the facts and pertinent provisions of law in the case shall be reported to the Congress with the reasons for such suspension. . . . If during the session of the Congress at which a case is reported, or prior to the close of the session of the Congress next following the session at which a case is reported, the Congress passes a concurrent resolution stating in substance that it favors the suspension of such deportation, the Attorney General shall cancel deportation proceedings. . . . Deportation proceedings shall not be canceled in the case of any alien who was not legally admitted for permanent residence at the time of his last entry into the United States, unless such alien pays . . . a fee of $18 . . . . [In the instant case this was paid.]   Upon the cancellation of such proceedings in any case in which fee has been paid the Commissioner shall record

ization which is still pending. In November, 1950, he was screened and passed by the Coast Guard for employment as a seaman on a merchant vessel.[3] In the same month he signed articles of employment as chief steward on the S. S. *Sir John Franklin,* a vessel of American registry with its home port in New York City. The voyage was to include calls at several foreign ports in the Far East. He remained aboard the vessel on this voyage but, at San Francisco, in March, 1951, the immigration

---

the alien's admission for permanent residence as of the date of his last entry into the United States . . . ."

8 CFR § 175.41 (q) states that for the purposes of §§ 175.41 to 175.62 "The term 'an alien who is a lawful permanent resident of the United States' means an alien who has been lawfully admitted into the continental United States, the Virgin Islands, Puerto Rico, or Hawaii for permanent residence therein and who has since such admission maintained his domicile in the United States: . . . ."

[3] For the nature and significance of such clearance, see Executive Order No. 10173, of October 18, 1950, especially §§ 6.10–1 to 6.10–9, now published, as amended, in 33 CFR, 1951 Cum. Pocket Supp. That order was issued pursuant to the Act of June 15, 1917, as amended by the Magnuson Act of August 9, 1950, 64 Stat. 427–428, 50 U. S. C. (Supp. V) § 191. It has now been implemented by regulations effective December 27, 1950, published, as amended, in 33 CFR, 1951 Cum. Pocket Supp., §§ 121.01–125.37. See also, *Parker* v. *Lester,* 98 F. Supp. 300, 191 F. 2d 1020.

Section 6.10–1, as it existed at the date of petitioner's clearance, provided:

"*Issuance of documents and employment of persons aboard vessels.* No person shall be issued a document required for employment on a merchant vessel of the United States nor shall any licensed officer or certificated man be employed on a merchant vessel of the United States if the Commandant is satisfied that the character and habits of life of such person are such as to authorize the belief that the presence of the individual on board would be inimical to the security of the United States: . . . ." 15 Fed. Reg. 7007.

Later regulations have published detailed security provisions as to who may be employed on merchant vessels of the United States of 100 gross tons and upward, whether engaged in foreign or other trade. 33 CFR, 1951 Cum. Pocket Supp., §§ 121.13–121.16.

inspector ordered him "temporarily excluded," under 8 CFR § 175.57, as an alien whose entry was deemed prejudicial to the public interest.

On the vessel's arrival in New York, March 29, petitioner's "temporary exclusion" was continued and he was not permitted to land. March 30, he sought a writ of habeas corpus from the United States District Court for the Eastern District of New York, charging that his detention was arbitrary and capricious and a denial of due process of law in violation of the Fifth Amendment to the Constitution of the United States. Purporting to act under 8 CFR § 175.57 (b), the Attorney General directed that petitioner be denied a hearing before a Board of Special Inquiry and that his "temporary exclusion be made permanent." The Attorney General continues to deny petitioner all information as to the nature and cause of any accusations against him and all opportunity to be heard in opposition to the order for his "exclusion." He is detained at Ellis Island "for safekeeping on behalf of the master of the S. S. 'Sir John Franklin.' "

The writ was issued but, after a hearing, it was dismissed by the District Court. 97 F. Supp. 592. The Court of Appeals for the Second Circuit affirmed. 192 F. 2d 1009. Both courts relied upon *Knauff* v. *Shaughnessy,* 338 U. S. 537. We granted certiorari because of the doubtful applicability of that decision and the importance of the issue in the administration of the Nation's immigration and naturalization program. 343 U. S. 933. Bail was denied by the District Court. 98 F. Supp. 717. It also was denied by the Court of Appeals, without prejudice to an application to this Court. Applications for bail are pending before the Commissioner of Immigration and Naturalization and this Court.

The issue is petitioner's detention, without notice of any charge against him and without opportunity to be heard in opposition thereto. Petitioner contends that

such detention is not authorized by 8 CFR § 175.57 (b). He contends also that, if that regulation does purport to authorize such detention, the regulation is invalid as an attempt to deprive him of his liberty without due process of law in violation of the Fifth Amendment. Agreement with petitioner's first contention makes it unnecessary to reach his second.

The case of *Knauff* v. *Shaughnessy, supra,* relied upon below, is not in point. It relates to the rights of an alien entrant and does not deal with the question of a resident alien's right to be heard. For purposes of his constitutional right to due process, we assimilate petitioner's status to that of an alien continuously residing and physically present in the United States.[4] To simplify the issue, we consider first what would have been his constitutional right to a hearing had he not undertaken his voyage to foreign ports but had remained continuously within the territorial boundaries of the United States.

1. It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there, he is a person within the protection of the Fifth Amendment. He may not be deprived of his life, liberty or property without due process of law.[5]

---

[4] In this opinion "exclusion" means preventing someone from entering the United States who is actually outside of the United States or is treated as being so. "Expulsion" means forcing someone out of the United States who is actually within the United States or is treated as being so. "Deportation" means the moving of someone away from the United States, after his exclusion or expulsion.

[5] ". . . The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction

Although it later may be established, as respondents contend, that petitioner can be expelled and deported, yet before his expulsion, he is entitled to notice of the nature of the charge and a hearing at least before an executive or administrative tribunal.[6]  Although Congress may pre-

between citizens and resident aliens.  They extend their inalienable privileges to all 'persons' and guard against any encroachment on those rights by federal or state authority."  *Bridges* v. *Wixon*, 326 U. S. 135, 161 (concurring opinion).

"The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society.  Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.  During his probationary residence, this Court has steadily enlarged his right against Executive deportation except upon full and fair hearing. . . .  And, at least since 1886, we have extended to the person and property of resident aliens important constitutional guaranties—such as the due process of law of the Fourteenth Amendment."  *Johnson* v. *Eisentrager*, 339 U. S. 763, 770–771.

The latter case also comments that "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act."  *Id.*, at 771.  That case related to nonresident enemy aliens who had never been in the United States, rather than to a lawful permanent resident in the position of petitioner.  There is no lack of physical presence for jurisdictional purposes in the instant case.

[6] ". . . But this court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law' as understood at the time of the adoption of the Constitution.  One of these principles is that no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends—not necessarily an opportunity upon a regular, set occasion, and according to the forms of judicial procedure, but one that will secure the

scribe conditions for his expulsion and deportation, not even Congress may expel him without allowing him a fair opportunity to be heard.[7] For example, he is entitled to a fair chance to prove mistaken identity. At the present stage of the instant case, the issue is not one of exclusion, expulsion or deportation. It is one of legislative construction and of procedural due process.[8]

This being recognized, we interpret this regulation as making no attempt to question a resident alien's consti-

---

prompt, vigorous action contemplated by Congress, and at the same time be appropriate to the nature of the case upon which such officers are required to act. Therefore, it is not competent for the Secretary of the Treasury or any executive officer, at any time within the year limited by the statute, arbitrarily to cause an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here, to be taken into custody and deported without giving him all opportunity to be heard upon the questions involving his right to be and remain in the United States. No such arbitrary power can exist where the principles involved in due process of law are recognized." *The Japanese Immigrant Case,* 189 U. S. 86, 100–101.

". . . It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing at least for aliens who had not entered clandestinely and who had been here some time even if illegally." *Wong Yang Sung* v. *McGrath,* 339 U. S. 33, 49–50. See also *Johnson* v. *Eisentrager, supra,* at 770–771; *Carlson* v. *Landon,* 342 U. S. 524, 538.

[7] See *Fong Yue Ting* v. *United States,* 149 U. S. 698, recognizing the right to expel and deport resident aliens. "When the Constitution requires a hearing, it requires a fair one, one before a tribunal which meets at least currently prevailing standards of impartiality." *Wong Yang Sung* v. *McGrath, supra,* at 50; *Kwock Jan Fat* v. *White,* 253 U. S. 454, 457–458, 464.

[8] It is to be noted that the cases generally cited in this field in relation to the exclusion, expulsion or deportability of resident aliens deal only with that ultimate issue, and not with the right of the resident alien to a hearing sufficient to satisfy procedural due process. The reports show that there were hearings and that in some cases

tutional right to due process. Section 175.57 (b) uses the term "excludable" in designating the aliens to which it applies. That term relates naturally to entrant aliens and to those assimilated to their status. The regulation nowhere refers to the expulsion of aliens, which is the term that would apply naturally to aliens who are lawful permanent residents physically present within the United States. Accordingly, we find no language in the regulation that would have required its application to petitioner had he remained continuously and physically within the United States.[9] It thus seems clear that the Attorney General would not have had the authority to deny to petitioner a hearing in opposition to such an order as was here made, provided petitioner had remained within the United States.

The regulation before us was issued by the Secretary of State and concurred in by the Attorney General, pursuant to Presidential Proclamations No. 2523, 3 CFR, 1943 Cum. Supp., 270, and No. 2850, 3 CFR, 1949 Supp., 41. The latter proclamation issued August 17, 1949, also "ratified and confirmed" the regulation. Those proclamations, in turn, depend upon § 1 of the Act of May 22, 1918, 40 Stat. 559, as amended, June 21, 1941, 55 Stat.

---

the Court considered whether the hearings had been fair. *E. g., United States* v. *Smith,* 289 U. S. 422, 424; *United States* v. *Corsi,* 287 U. S. 129, 131; *United States ex rel. Claussen* v. *Day,* 279 U. S. 398, 400; *Quon Quon Poy* v. *Johnson,* 273 U. S. 352, 358; *Lewis* v. *Frick,* 233 U. S. 291, 293; *Lapina* v. *Williams,* 232 U. S. 78, 83; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 729.

[9] The preceding subsection, 175.57 (a), uses the additional word "deported" but only to supplement "excluded": "Any alien so temporarily excluded by an official of the Department of Justice shall not be admitted and shall be excluded and deported unless the Attorney General, after consultation with the Secretary of State, is satisfied that the admission of the alien would not be prejudicial to the interests of the United States." 8 CFR.

252, 22 U. S. C. § 223.   It is not questioned that the regulation, as above interpreted, comes within these authorizations, or that such authorizations have been extended to include the dates material in this case.   66 Stat. 163, 333. We find nothing in the statute or the proclamations which calls for, permits or sustains a broader interpretation of 8 CFR § 175.57 (b) than we have given to it.   The wording also now reflects congressional intent because substantially the same language was inserted by Congress in the Subversive Activities Control Act of 1950, 64 Stat. 1008.   See note 1, *supra*.

2. Petitioner's final contention is that if an alien is a lawful permanent resident of the United States and also is a seaman who has gone outside of the United States on a vessel of American registry, with its home port in the United States, and, upon completion of such voyage, has returned on such vessel to the United States and is still on board, he is still, from a constitutional point of view, a person entitled to procedural due process under the Fifth Amendment.   We do not regard the constitutional status which petitioner indisputably enjoyed prior to his voyage as terminated by that voyage.   From a constitutional point of view, he is entitled to due process without regard to whether or not, for immigration purposes, he is to be treated as an entrant alien, and we do not now reach the question whether he is to be so treated.

Section 175.57 (b)'s authorization of the denial of hearings raises no constitutional conflict if limited to "excludable" aliens who are not within the protection of the Fifth Amendment.   The assimilation of petitioner, for constitutional purposes, to the status of a continuous resident physically present in the United States also accords with the Nation's immigration and naturalization program.   For example, for purposes of naturalization, such an assimilation was expressly prescribed in the Nationality Act of 1940:

"SEC. 307. (a) No person . . . shall be naturalized unless such petitioner, (1) immediately preceding the date of filing petition for naturalization has resided continuously within the United States for at least five years . . . .

.　　　.　　　.　　　.　　　.

"(d) The following shall be regarded as residence within the United States within the meaning of this chapter:

.　　　.　　　.　　　.　　　.

"(2) Continuous service by a seaman on a vessel or vessels whose home port is in the United States and which are of American registry or American owned, if rendered subsequent to the applicant's lawful entry into the United States for permanent residence and immediately preceding the date of naturalization." 54 Stat. 1142–1143, 8 U. S. C. § 707. See also, § 325, 54 Stat. 1150, as amended, 64 Stat. 1015, 8 U. S. C. (Supp. V) § 725.[10]

While it may be that a resident alien's ultimate right to remain in the United States is subject to alteration by statute or authorized regulation because of a voyage undertaken by him to foreign ports, it does not follow that he is thereby deprived of his constitutional right to procedural due process. His status as a person within the meaning and protection of the Fifth Amendment cannot be capriciously taken from him. Where neither Congress, the President, the Secretary of State nor the Attorney General has inescapably said so, we are not

---

[10] This provision survives in a modified form in § 330 of the Immigration and Nationality Act of 1952, 66 Stat. 251. Section 330 (b) includes a savings clause affecting those who applied for naturalization before September 23, 1950. Section 405 (a) also contains a general savings clause. 66 Stat. 280.

ready to assume that any of them has attempted to deprive such a person of a fair hearing.[11]

This preservation of petitioner's right to due process does not leave an unprotected spot in the Nation's armor. Before petitioner's admission to permanent residence, he was required to satisfy the Attorney General and Congress of his suitability for that status.[12]    Before receiving clearance for his foreign cruise, he was screened and approved by the Coast Guard.[13]    Before acceptance of his petition for naturalization, as well as before final action thereon, assurance is necessary that he is not a security risk.    See 8 U. S. C., c. 11, Subchapter III—Nationality Through Naturalization, §§ 701–747, as amended.

We do not reach the issue as to what would be the constitutional status of 8 CFR § 175.57 (b) if it were interpreted as denying to petitioner all opportunity for a hearing.    Also, we do not reach the issue as to what will be the authority of the Attorney General to order the deportation of petitioner after giving him reasonable notice of the charges against him and allowing him a

---

[11] Existing statutory and administrative provisions for "Exclusion Without Hearing" are discussed in the Report of the President's Commission on Immigration and Naturalization entitled "Whom We Shall Welcome" dated January 1, 1953, at pages 228–231.    The discussion treats the provisions as applicable to entrant and reentrant aliens but does not even suggest that they are applicable to aliens lawfully admitted to permanent residence and physically present within the United States.    The report discusses the harshness of the "reentry doctrine" and recommends its modification at pages 199–200.    It does not, however, even suggest that the reentry doctrine attempts to limit the constitutional right to a hearing which resident aliens, in the status of petitioner, may have under the Fifth Amendment.    The instances of hardship which the report cites appear to have been disclosed at hearings held on the issue of the alien's right to reenter.

[12] See note 2, *supra*.

[13] See note 3, *supra*.

hearing sufficient to meet the requirements of procedural due process.

For the reasons stated, we conclude that the detention of petitioner, without notice of the charges against him and without opportunity to be heard in opposition to them, is not authorized by 8 CFR § 175.57 (b). Accordingly, the judgment of the Court of Appeals is

> *Reversed and the cause remanded to the District Court.*

MR. JUSTICE MINTON dissents.