**PROFESSIONAL SPORTS, LTD.,**
Plaintiff,

v.

The **VIRGINIA SQUIRES BASKETBALL CLUB LIMITED PARTNERSHIP** and Earl Foreman, Defendants,

**American Basketball Association and Mike Storen, Commissioner,** Intervenors.

**Civ. A. No. SA74CA26.**

United States District Court,
W. D. Tex.,
San Antonio Division.
March 6, 1974.

J. Burleson Smith, Terry S. Bickerton, R. Laurence Macon, Cox, Smith, Smith, Hale & Guenther, San Antonio, Tex., for plaintiff; Carl Wright Johnson, San Antonio, Tex., of counsel.

Fred R. Clark, Nicholas & Barrera Inc., San Antonio, Tex., for defendants.

George H. Spencer, Randolph P. Tower, Clemens, Weiss, Spencer & Welmaker, San Antonio, Tex., for intervenors.

## ORDER GRANTING PERMANENT INJUNCTION

SPEARS, Chief Judge.

On this the 6th day of March, 1974, came on to be considered the plaintiff's application for a permanent injunction against the defendants, Earl Foreman and the Virginia Squires, as well as the Intervenors, the American Basketball Association and its Commissioner, Mike Storen. A consolidated hearing on plaintiff's applications for both preliminary and permanent injunctions was held, by agreement of the parties, on February 15, 1974, and the Court has fully considered all of the evidence submitted at such hearing, together with the pleadings, affidavits and briefs filed, in addition to the arguments of counsel. In the firm belief that the law and the facts, as well as the equities, are with the plaintiff and against the defendants and intervenors, the application for permanent injunction will be granted.

The record herein reflects that early in December 1973, the plaintiff, Professional Sports, Ltd., the owners and operators of a professional basketball team in the American Basketball Association (ABA), known as the San Antonio Spurs, concluded that the Spurs were in need of a premier player. Numerous members of the ABA, including Earl

Foreman, owner of the Virginia Squires, were contacted, and after some negotiations had been conducted, a contract was entered into between the Spurs and Mr. Foreman on January 13, 1974, pursuant to which Mr. Foreman agreed to assign the player contract of George Gervin to the Spurs for $225,000, payable immediately, with the understanding however, that the deal would be kept secret until the day following the all star game to be played on January 30, 1974, at which time Mr. Gervin would be delivered to the Spurs. The evidence shows that the $225,000 was paid by the Spurs in accordance with the agreement, but Mr. Foreman failed and refused to deliver the player as he promised to do.

The Commissioner, Mike Storen, first learned, of the Gervin contract from Mr. Foreman on January 20, 1974, and at the same time, Mr. Foreman told the Commissioner that he was negotiating with a group to sell his Virginia Squires franchise. However, prior to the execution of the contract, the commissioner had warned the Spurs and the Squires not to make any deal before the all star game.[1]

Later, on January 25, 1974, the Spurs representative, Angelo Drossos, mentioned the existence of the Gervin contract to the Commissioner, and on January 29, 1974, Mr. Drossos was informed by Mr. Foreman that the Commissioner would not approve the assignment of the Gervin contract to the Spurs. On February 1, 1974, the Commissioner announced his "decision" during a conference call by telephone, and subsequently, on February 4, 1974, sent a telegram confirming said "decision".

This suit was filed on Friday, February 1, 1974, and on Monday, February 4, 1974, upon instructions from this Court, a courier was dispatched by plaintiff to Chevy Chase, Maryland, Norfolk, Virginia, and Washington, D.C., for the purpose of serving Mr. Foreman with copies of all pleadings and briefs filed by plaintiff, and advising Mr. Foreman that the Court would consider plaintiff's request for a temporary restraining order on February 6, 1974, at 10:00 A.M.

At the hearing on the request for a temporary restraining order, held at the appointed time, the defendant, Earl Foreman, appeared by counsel, and the ABA, together with its Commissioner, Mr. Storen, appeared by counsel and moved for leave to intervene. The Court, after a hearing, allowed the intervention, granted the temporary restraining order, and set a hearing on plaintiff's application for preliminary injunction, at which all parties appeared in person and by counsel, except Mr. Foreman who appeared only by counsel.

The Court in considering the plaintiff's Application for a Permanent Injunction is not unmindful of the factors considered in granting the previous preliminary injunction. Allison v. Froehlke, 470 F.2d 1123 (5th Cir. 1972). Basic factors to be considered in granting or denying injunctive relief are whether the plaintiff will suffer irreparable injury if denied injunctive relief for which there is no adequate remedy at law, Beacon Theaters v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); and the competing claims of the other parties involved, Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). In this regard the trial court is vested with broad discretionary powers to shape injunctive relief. Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).

Courts have generally recognized that an athletic club may suffer irreparable harm sufficient for an injunction to lie when it is deprived of the services of a star athlete. Boston Professional Hockey Assn., Inc. v. Cheevers, 472 F.2d 127 (1st Cir. 1972); Washington Capitols

1. The Commissioner stated that at a meeting of the executive committee of the American Basketball Association, held in Atlanta, Georgia, on January 8, 1974, he was told of the impending trade of George Gervin by Angelo Drossos. The Commissioner stated that he told both Foreman and Drossos "that [he] could not allow that and it was a matter that would have to be settled."

Basketball Club, Inc. v. Barry, 304 F. Supp. 1193 (N.D.Cal.1969), aff'd 419 F. 2d 472 (9th Cir. 1969). This rule has also been applied by the Texas Courts in cases in which the athlete is one who possesses exceptional and unique knowledge, skill, and ability. Dallas Cowboys Football Club, Inc. v. Harris, 348 S.W.2d 37 (Tex.Civ.App.Dallas 1961, no writ).

All of the parties to this suit concede that the subject of the assigned player contract in controversy, George Gervin, is a player who possesses unique knowledge, skill, and ability in the sport of basketball, and this Court is of the opinion that the plaintiff would suffer immediate and irreparable harm if deprived of the services of Mr. Gervin. There is a strong likelihood that its standing in the ABA would suffer; and its chances of obtaining a spot in the ABA playoffs would also be diminished.

In addition, this Court is of the opinion that, on balance, the equities are with the plaintiff. To require the return of Mr. Gervin to the Virginia Squires would be to reestablish the inequitable situation that prevailed prior to the commencement of this lawsuit, wherein the defendants retained both the plaintiff's money and the player. In this connection, it is significant that the defendants to date have not tendered to plaintiff the $225,000 paid as consideration for the assignment of Gervin's contract. In view of the evidence presented at the hearing, it would be detrimental to Mr. Gervin if he were prohibited from playing for any team in the ABA, because if a professional athlete is prohibited from engaging in his chosen profession, "he will suffer irreparable injury in that a substantial part of his play-

ing career will have been dissipated", and "his physical condition, skill and co-ordination will deteriorate from lack of high-level competition." Haywood v. National Basketball Assn., 401 U.S. 1204, 1205, 91 S.Ct. 672, 673, 28 L.Ed.2d 206 (1971).

The real issue, therefore, is whether the plaintiff should prevail upon the merits. In making this determination, the Court is primarily concerned with the legality of the commissioner's actions, rather than any lack of good faith on his part.

It is the position of the intervenors and defendants that the Commissioner of the ABA is authorized and empowered by the by-laws to arbitrate and settle disputes between member clubs relative to player contracts; that such a dispute arose between San Antonio and Virginia; that the Commissioner, acting pursuant to Article IV, Sections 5 and 6,[2] did arbitrate the dispute,[3] and made a final decision which bound the plaintiff and defendant. The Commissioner's "decision" is embodied in a telegram sent to the parties dated January 4, 1974, reading as follows:

> In regard to the dispute which exists between San Antonio and the Virginia Squires relative to who has title to George Gervin, I have made my investigation, spoken to the principals and have reviewed the appropriate documents. In accordance with the rights vested in me as Commissioner, and pursuant to Article IV, Sections 5 and 6, of the ABA by-laws, I have arrived at the following decision:
>
> 1. The Virginia Squires retain title to the player.

2. Article IV, Sections 5 and 6 state as follows:
Section 5. The Commissioner shall hear and finally decide any dispute to which a player or a coach is a party. In all matters pertaining to the eligibility of players and all disputes arising between clubs relative to title to players' contracts, the Commissioner shall make such investigation, and call such witnesses and demand such papers as he deems necessary, and his decision in such matters shall be final.

Section 6. Except as otherwise provided in these by-laws, all disputes between Member Clubs, which said clubs are unable to settle within a period of five (5) days, shall be settled by the Commissioner and his decision shall be accepted as final by all concerned.

3. According to the record both Drossos and Foreman agreed that there was no dispute between them concerning the Gervin contract.

2. Earl Foreman and the Virginia Squires are to return all monies to San Antonio immediately. Earl Foreman and the Squires must additionally pay the interest which has accrued to San Antonio, and Earl Foreman and the Squires must also pay the reasonable, attorney fees for the preparation and execution of all legal documents prior to February 1, 1974.

■■■ The by-laws of the ABA constitute a contract between the member clubs and the Association. Talton v. Behncke, 199 F.2d 471 (7th Cir. 1952). Article IV, Section 5, requires that the member clubs accept the Commissioner's decision as an arbitrator when a dispute arises between them relative to the title of a player's contract. In arbitration the parties must agree to submit an issue to the arbitrator, however where consent has not been given, or to the extent that limitations have been placed on his authority, an arbitrator is powerless to make an enforceable decision. International Union of Operating Engineers, Local No. 450 v. Mid-Valley, Inc., 347 F.Supp. 1104 (S.D.Tex.1972). Under Sections 5 and 6 of Article IV, the parties to the by-laws only agreed to abide by the Commissioner's ruling when he settled a dispute between member clubs. After carefully reviewing the evidence adduced at the hearing, the Court is of the opinion that there is no basis in the record for the Commissioner's self serving declaration that, "Virginia and San Antonio have a dispute concerning the sale of a contract." On the contrary, the only dispute in the case was and is the one generated by the Commissioner himself when he advised Mr. Foreman, owner of the Squires, that he was not going to approve the assignment of Mr. Gervin's contract, thereby putting Mr. Foreman under considerable duress. At the time, Mr. Foreman was attempting to sell his Virginia franchise, and he admittedly needed the support of the Commissioner in that undertaking. In this connection, Mr. Foreman alleged, in unequivocal language, that his refusal to deliver the player Gervin to San Antonio was "founded upon the fact that . . . the Commissioner of the American Basketball Association has rendered a decision which prohibits the defendants from performing the obligations of the Assignment Contract." [4] While the by-laws clearly contemplate arbitration by the Commissioner of disputes between clubs when he is acting impartially, it would be unreasonable and unrealistic to believe that the club members ever intended to authorize him to settle disputes which he himself had instigated, and no such intent can be inferred from Sections 5 and 6 of Article IV.

■ The Commissioner insists that if his "decision" can be substantiated by any portion of the by-laws other than Article IV, Sections 5 and 6, then it should be sustained. Although that contention is highly debatable, it is difficult to see how it can afford the Commissioner any comfort, even if assumed, *arguendo*, to be valid. For example, the Commissioner cites sections 8(d) and 10A(2) of Article IV as support for this proposition.[5] Notice and hearing are re-

---

4. Foreman also alleged that plaintiff had breached the contract, but this was a legal conclusion made without any support in the record, and he chose not to appear in court to testify.

5. Article IV, Section 8(d) states:
The Commissioner is authorized and empowered, after notice and hearing: (d) To cancel or terminate any contracts;
Article IV, Section 10A(2) states: The Commissioner is authorized and empowered after notice and hearing:
(2) To cancel the contract of any such person for violation of the provisions of the Certificate of Incorporation and By-Laws or for any action detrimental to the welfare of the League or professional basketball.
Provided, however, that suspension by the Commissioner, or cancellation of any contract by the Commissioner, may within ten (10) days of such order be appealed from by any member club; and such appeal shall be heard by the Board of Trustees within five (5) days. After hearing the appeal the Board of Trustees by a three-fourths (¾) vote of those present, may modify or reverse the action of the Commissioner.

quired as a prerequisite to action being taken pursuant to these sections. Irrespective of any "due process" requirements, the principles of fundamental fairness, as well as the by-laws [6] themselves, contemplate a meaningful "notice and hearing" in actions taken under these sections, and since proceedings of this nature could have the effect of depriving a party of some property right, these terms should be construed to require at least the minimum essentials of "due process".

> Notice means information, an advice, or written warning, in more or less formal shape, intended to apprise a person of some proceeding in which his interests are involved, as informing him of some fact which it is his right to know and the duty of the notifying party to communicate. Blacks Law Dictionary, Rev. Fourth Ed. (1968), page 1210.

> "Notice" within the concept of due process comprehends notice of the nature of the proceedings, as well as the time and place of the hearing therein, and such principle derives from the common law and is secured by constitutional guarantees. 28A Words and Phrases, page 499.

Notice "must be of such a nature as reasonably to convey the required information and it must afford a reasonable time for those interested to make their appearance." Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L.Ed. 865 (1950).

A hearing is the "reception of facts and arguments thereon for the sake of deciding correctly." 39 C.J.S. Hearing, page 875. There is no fixed procedure required to make a hearing conform to the requirements of due process, Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); however, the parties must be given "a fair opportunity to be heard." Kwong Hai Chew v. Colding, 344 U.S. 590, 598, 73 S.Ct. 472, 478, 97 L.Ed. 576 (1953); and the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

No notice of any hearing to be held at a specified time and place was given either orally or in writing; there is no indication that the Commissioner apprised the plaintiff of the nature of the charges; and he certainly did not apprise plaintiff of the basis for his authority to act. There could have been no "meaningful" hearing, for the parties had no opportunity to present witnesses, documents or other relevant information; nor could the informal discussions in the rooms and hallways of hotels be considered a fair and full hearing.[7]

Similarly, the Commissioner can find no solace from Article IV, Section 10A(3)[8], authorizing him to "assign any

---

6. Article XI, Section 1(a) states:
   Section 1. (a) Any notice required to be given by any of the provisions of the Certificate of Incorporation and By-Laws shall be deemed to be sufficient if in writing and addressed to the last known address of the addressee and deposited in the United States mails with postage prepaid, unless the Certificate of Incorporation and By-Laws specifically require some other or different form of notice.
   *See also* Article IV, Section 5, note 2, *supra.*

7. Actually, the informal discussions were held, for the most part, on the run, between hotel rooms and hallways in Atlanta, Georgia, and Norfolk, Virginia, over a period of three weeks. Seldom were *Drossos* (Spurs), Foreman (Squires) and Storen (Commissioner) together when the Gervin matter was mentioned. On the contrary, the evidence demonstrates that usually each owner was being told separately by the Commissioner that he would not approve the contract. The truth of the matter is that the Commissioner had already prejudged the matter, and he never even attempted to go through the formality of giving proper notice and holding a hearing.

8. Article IV, Section 10A(3) states:
   The Commissioner is authorized and empowered after notice and hearing:
   (3) To expel any member club, any director, officer or stockholder of the American Basketball Association, cancel or forfeit the franchise of any member club or the interest of any Director, officer or stockholder in any club in the American Basketball Association, declare any player to be a free agent

player or players to another member club or to a number of member clubs, if in his opinion he or they are guilty of an act or acts, which are detrimental to the League, or professional basketball, provided the Commissioner's decision is approved and ratified by a vote of at lease [sic] three-fourths (¾) of the member clubs." He has attempted to invoke the foregoing provision while still insisting that his prior ruling under Article IV, Sections 5 and 6, is valid. But if his prior ruling is valid, then Gervin belongs to the Squires, so there would be no occasion to assign the player to that club. However, if the Commissioner's prior ruling is invalid, as this Court holds that it is, then Gervin is the property of the Spurs. As a consequence, if the judgment of this Court becomes final, it may very well be that the Commissioner could initiate action under Article IV, Section 10A(3) to assign Gervin back to the Squires, if circumstances arising in the future should, in his opinion, justify it.

The simple truth is that the member clubs have not given the Commissioner the power and authority he claims. He admitted as much when he testified that he didn't think he has "the right to approve or disapprove contracts", and the clubs of the ABA said the same thing when they made it clear in the by-laws that actions by the Commissioner in such things as cancelling contracts; ex-

pelling member clubs, or the officers, directors, and stockholders of the Association; cancelling or forfeiting the franchise of any member club, or the interest of any director, officer, or stockholder thereof; or declaring any player to be a free agent; or assigning any player to another member club, are contingent upon his gaining the approval and ratification of at least three-fourths of the member clubs.

■ The Commissioner further argues that the Gervin contract is invalid, because certain regulations promulgated by the Commissioner were not followed. These regulations, designed to make certain that the League office is advised as to the details of all player transactions between clubs so that possible points of controversy can be clarified, provide that: (1) a player whose contract is sold or assigned to another club will be notified; (2) the salary of a traded player will be properly adjusted between teams; and (3) it will be understood that in the event a traded player fails to report, he is considered to be the property of the team to which he was traded. The regulations assist the Commissioner in performing his administrative responsibilities, and that is all they can do, since there is nothing in the by-laws authorizing him to increase his power and expand his authority by administrative fiat. This Court is unable to agree that Article IV, Sections 5 and

or assign any player or players to another member club or to a number of member clubs, if, in his opinion, he or they are guilty of an act or acts which are or may be detrimental to the League or to professional basketball, provided the Commissioner's decision is approved and ratified by a vote of at lease three-fourths (¾) of the Member Clubs. In the event of such cancellation or forfeiture of the franchise of any Member Clubs, the Commissioner is authorized and empowered, subject to the approval and ratification by a vote of three-fourths (¾) of the Member Club or Clubs, any or all player contracts or interests therein and any or all leases for arenas and playing areas or interests therein (where such assignment is legally feasible), or any and all players on selection or reserve lists, which may at the time of cancellation or forfeiture stand in

the name or names of (a) the offending club (b) in the name or names of the owners of the offending club or (c) in the name or names of any nominees thereof. The Commissioner's decision, if approved and ratified by three-fourths (¾) of the Member Clubs, shall be final, binding conclusive and unappealable, and every party who may be involved or affected by the Commissioner's decision whether or not so approved and ratified, hereby releases the Commissioner and hereby waives every claim each or any or all of them have or may have against the Commissioner, individually and in his official capacity, against the American Basketball Association, and against every director, officer and stockholder, partner or individual owner of every Member Club for damages and for all claims and demands whatsoever arising out of or in connection with any decision of the Commissioner.

6 of the by-laws give the Commissioner any such authority. The Commissioner admitted that his office performed only a "bookkeeping function" with respect to trades.

The purchase agreement and the player contract contain provisions relating to the time the player will report to the assignee club, and recognize the possibility that the player will either refuse to play basketball for the Spurs, or be prohibited from doing so. In addition, the parties bound themselves to use their best efforts to obtain the approval of the transaction from the ABA. The Commissioner refers to these and similar provisions in support of his argument that both contracting parties understood that they had to have the approval of the Commissioner before the contract involving the player Gervin could become final and binding. However, Mr. Drossos testified that the question concerning prior Commissioner approval never arose; that his position, communicated to the Commissioner, was that the by-laws did not give the Commissioner the right to approve or disapprove;[9] and that this was substantiated by the fact that $225,000 was paid in cash to Mr. Foreman, who accepted it in return for his agreement to deliver the player after the all star game. Clearly, there is no indication that the parties intended that anything in the contracts would take precedence over the by-laws of the Association.

The Court finds that the plaintiff has performed all of its obligations under the contract with Earl Foreman; that the defendant Foreman has failed and refused, and still fails and refuses, to return the $225,000 purchase price to the plaintiff; that there was never any "dispute", as contemplated by the ABA by-laws, between the Spurs and Foreman, until the Commissioner injected himself into the matter by persuading Foreman to refuse to deliver the player to the Spurs; that under the circumstances Commissioner Storen had no authority whatsoever to cancel or alter the contract executed in good faith by and between the parties involved; that legal title to the player Gervin is vested in the plaintiff; that the action now taken by this Court is not contrary to the public interest; that the plaintiff will suffer irreparable injury if this application is denied; and that little, if any, harm will result to the other parties if the injunctive relief is granted.

For the reasons hereinabove set forth, it is hereby ordered, adjudged, and decreed by the Court that the Virginia Squires Basketball Club Limited Partnership and Earl Foreman, as well as the American Basketball Association, and its Commissioner, Mike Storen, their agents, servants, attorneys and representatives be and they are hereby permanently enjoined, subject to such further action based upon matters arising in the future as may be taken pursuant to the by-laws of the American Basketball Association:

(1) From committing any act, overt or passive, calculated to prevent, disrupt, or interfere in any manner with the contractual relationship between Professional Sports, Ltd., and George Gervin;

(2) From committing any act, overt or passive, that causes or allows George Gervin to play basketball on behalf of any American Basketball Association franchise, other than the franchise operated by Professional Sports, Ltd.

The defendants, The Virginia Squires Basketball Club Limited Partnership and Earl Foreman are hereby ORDERED to specifically perform their obligations under the contract entered into with Professional Sports, Ltd., dated January 13, 1974.

---

9. It is interesting to note that on November 20, 1973, at an executive committee meeting of the ABA, of which Mr. Drossos was a member, the Commissioner felt it necessary to have the committee pass a special resolution authorizing him to restrict Mr. Foreman from making any further player sales while Mr. Foreman was deficient in his obligations to the ABA. That resolution, however, expired by its own terms shortly thereafter.

While the intervenors, the American Basketball Association and its Commissioner, Mike Storen, their agents, servants, attorneys, and representatives, are enjoined from taking any action against the plaintiff, Professional Sports, Ltd., for acts or conduct comprising the subject matter of this lawsuit, the American Basketball Association and its Commissioner, Mike Storen, their agents, servants, attorneys, and representatives are not enjoined from utilizing any provision of the by-laws with respect to matters that may arise in the future concerning either party hereto, or the player George Gervin.

All costs incurred herein shall be assessed against the defendants, The Virginia Squires Basketball Club Limited Partnership and Earl Foreman, for all of which let execution issue.

In the event this judgment becomes final, the $50,000 bond posted by plaintiff in connection with the temporary restraining order and preliminary injunction previously issued, is hereby cancelled, and the Clerk is directed to return the money deposited for such purpose to the plaintiff.