DUFFY, District Judge:
I dissent.
The facts that are pled and developed by the Petition and submission of the government show that the Petitioner, Rahinah Ibrahim, was in the United States from 2001 to 2005 on a student visa to earn her doctorate from Stanford University. Prior to the time she left her native Malaysia for Stanford, she had been an assistant professor at the University Putra Malaysia in Serdang, Malaysia. Near the end of her doctoral studies, Petitioner was invited to participate in a symposium at that same university to present her research. She voluntarily purchased her ticket to Malaysia and made the other necessary arrangements to attend the symposium. On January 2, 2005, Petitioner arrived at the airport in San Francisco as per the ticket and was advised by a *1000 representative of United Airlines that she was on a “No Fly” list. Instead of issuing her a boarding pass, the representative called the San Francisco police. Petitioner was arrested and detained for two hours until F.B.I. agents arrived and directed that she be released.[1] The Petitioner was told she was no longer on the “No Fly” list at that time. The very next day, Petitioner went to the airport where she was again told her name was on the “No Fly” list. Petitioner nevertheless boarded her plane, and although she claims she was subjected to enhanced scrutiny and searches at every stopover on the trip, she successfully arrived in Malaysia.
Petitioner attended the symposium and stayed in Malaysia for an additional two months until March 10, 2005, when she attempted to board a return flight to the United States. She was prevented from doing so and was told by a ticketing agent in Malaysia that she would have to wait for clearance from the U.S. embassy before being permitted to board. She was also told by another ticketing agent that a note next to her name instructed airport personnel to alert the police and have her arrested.
Petitioner has been unable to return to the United States since leaving in 2005. She has remained in contact with her friends at Stanford, using electronic devices and meeting with them in person outside of the United States. She claims, however, that such means of contact are inadequate and lists them among her injuries in bringing the present action. Petitioner also claims her alleged placement on the “No Fly” list constitutes injury because she is prevented from flying U.S. airline carriers to other foreign countries and from otherwise flying over U.S. airspace.
On March 24, 2005, Petitioner submitted a request to the Transportation Security Administration’s (“TSA”) “Passenger Identity Verification” program to clear her name from the “No Fly” list. Petitioner received a written response approximately one year later, advising her that any records warranting corrections had been modified. This response did not indicate whether Petitioner’s name appeared on the “No Fly” list or other terrorist watchlists.
On April 14, 2005, an American consul in Malaysia sent Petitioner a letter. She learned that the State Department had revoked her student visa on January 31, 2005.[2] The letter referenced Section 212(a)(3)(B) of the Immigration and Nationality Act (“INA”) as grounds for revocation.[3] This INA provision was again *1001 referenced in the denial of her later application for a visitor visa. Petitioner claims, however, that the denials of her original student visa and her visitor visa application are solely because she is on the “No Fly” list. She instituted this Petition to remove her name from the “No Fly” list and other terrorist watchlists with the announced expectation that, the State Department would then issue her a visitor visa. It is clear that one of the principal reasons Petitioner plans to visit the United States is to advance her academic career.
The only evidence in the record concerning the relationship between visa decisions and the “No Fly” list is the flat statement by the State Department that the revocation of Petitioner’s student visa did not depend on Petitioner’s being on the “No Fly” list: “[v]isa decisions are independent from and made without reference to any ‘No Fly’ list.”
As the majority recognizes, courts cannot interfere with the granting (or revocation) of a visa. (See Bustamante v. Mukasey, 531 F.3d 1059, 1060 (9th Cir.2008)); see also 8 U.S.C. §§ 1104(a); 1201(1). The majority, however, would grant Petitioner a hearing on the question of her placement on the “No Fly” list, among other government watchlists. They claim that the Petitioner has a constitutional right to such a hearing because of her “substantial voluntary connections” to the United States. The government has argued that an alien located outside the jurisdiction of the United States cannot seek a mandatory injunction for alleged “as applied” unconstitutionality. I do not believe it necessary to adopt this bright line test that the government suggests. Instead, let us turn to the cases cited by the majority as precedent for their decision.
The majority relies on a number of cases to show that certain aliens located outside the United States can challenge the constitutionality of U.S. laws. One such case is Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953). In that case, the petitioner, of Chinese ancestry, entered the United States in the early 1940s during World War II. He served honorably in the United States Merchant Marine and married an American woman who had been born in this country. After the war, he continued in his career as a seaman. He received seaman’s papers from the United States Coast Guard, and in 1950 he obtained a job on the S.S. Sir John Franklin, an American flagship. The voyage took several months. At all times during this voyage, Kwong Hai Chew was serving as a seaman under American articles and thus was under de facto jurisdiction of the United States. If he had violated U.S. law, the United States could have prosecuted him. Kwong Hai Chew was also entitled to U.S. “maintenance and cure.”[4] Upon the ship’s return to San Francisco, Kwong Hai Chew was denied entry, and the ship thereafter sailed to New York where Kwong Hai Chew was put on Ellis Island “for safe-keeping on behalf of the master of the S.S. ‘Sir John Franklin.’ ” Id. at 595, 73 S.Ct. 472. The Supreme Court recognized that, while Kwong Hai Chew was on the high seas, he was at all times under the jurisdiction of the United States, as evidenced by the American flag on the S.S. Sir John Franklin.
*1002 Kwong Hai Chew did not attack the validity of the law that permitted the United States Attorney General to exclude certain aliens from entry into the United States. The Court viewed his position as if he were within the continental United States at all times in question and permitted the issuance of the writ of habeas corpus. Kwong Hai Chew merely proves the majority’s “uncontested proposition that if Ibrahim had remained in the United States,” she would have been able to challenge the constitutionality of the government’s action in placing her on the terrorist watchlists. In the instant case, Petitioner resides in Malaysia and, therefore, does not enjoy the right of constitutional challenge.
Slightly more instructive on the issue of whether aliens located outside of the United States can bring constitutional claims is Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). There, the action was brought on behalf of certain aliens held captive at the U.S. naval base at Guantanamo Bay, Cuba. Boumediene and his fellow petitioners found themselves under de facto U.S. jurisdiction in Guantanamo Bay, where the United States exercised “absolute and indefinite control.” Id. at 727, 128 S.Ct. 2229. The Supreme Court rejected the same bright line test proposed by the government here and found that Boumediene and his fellow petitioners had the right to seek the writ of habeas corpus. The Supreme Court’s decision did not disregard the extraterritoriality of the claims being asserted, but focused instead on the fact that Boumediene and his fellow petitioners held at Guantánamo Bay were in U.S. custody following capture in, and transfer from, various foreign lands. Here, the Petitioner, knowing that she could be forever banned from returning to this country, voluntarily left and returned to .her native land, outside of U.S. jurisdiction.[5] No one can believe that she did not know exactly the consequences of the choice she made.
In Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), a group of German nationals sought the writ of habeas corpus after being arrested by the United States Army in China, convicted of violating the laws of war by a Military Commission sitting in China, and imprisoned in Germany. The Supreme Court held that such “enemy aliens, resident, captured and imprisoned abroad” did not have the right to seek the writ. Id. at 777, 70 S.Ct. 936. The majority concludes that because the Petitioner is not such a person, she may seek redress for her constitutional claims. The majority, however, overlooks the fact that, like the petitioners in Eisentrager, the Petitioner does not find herself under U.S. jurisdiction, whether de jure or de facto, as did the petitioners in Boumediene.
I must also note a crucial distinction between Boumediene and Eisentrager on the one hand and the present case on the other. The petitioners in the habeas cases *1003 cited above sought to challenge their detention at U.S. hands, whereas the Petitioner is not in our custody and therefore can have no grounds on which to seek similar relief.
The majority relies on the standard set forth by the Supreme Court in United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), to conclude that Petitioner may assert her constitutional claims. Verdugo was a Mexican national who was arrested in Mexico, brought to the United States against his will and imprisoned pending the outcome of narcotics smuggling charges against him. The Supreme Court held that Verdugo had no right to assert claims that the search and seizure of his property in Mexico constituted a Fourth Amendment violation when he had “no previous significant voluntary connection with the United States....” Id. at 271, 110 S.Ct. 1056.
The majority distinguishes Verdugo-Urquidez by finding that Petitioner “established a substantial voluntary connection with the United States through her studies at a distinguished American university.” I cannot come to the same conclusion. If we were to hold today that Petitioner may assert her constitutional claims because she formed a “substantial voluntary connection with the United States” while here on a student visa, then we would be hard pressed not to allow all alien students who studied in the United States and subsequently left the country to bring constitutional claims in our courts.
The majority seems to think that the holding of this case can be restricted to Petitioner and her constitutional claims alone. In doing so, however, it points to no reason why those similarly situated to the Petitioner could not avail themselves of the holding of this case. The majority believes it is enough that Petitioner (1) was in the country for a period of time, and (2) that upon departure she intended to come back to the country. If this were sufficient to vest constitutional rights in an alien located outside of the United States to bring actions in the United States against the government, there would be a significant number of aliens in the world just waiting to get into court. For example, a visitor to this country who overstays his visa, makes a livelihood in this country for a substantial amount of time, and chooses voluntary departure when caught as an illegal alien, could fit within the class of people who would have such rights. He would have been in the country for a “substantial time” and would have friends and contacts in this country — as would most illegal aliens. As such, he would most likely have the desire and intention to return to this country.
As this example shows, the majority holding is too broad, while the government’s bright line argument based on extraterritoriality is too narrow and hidebound for use in the modern world.
In the case at bar, however, there is no need to set forth a definitive test because the simple answer is that Petitioner has not shown a “substantial voluntary connection” with the United States, which is the measurement the majority believes the precedent would require. The Petitioner does not suggest that she ever worked in or paid taxes to the United States or indeed did anything (except study at a university) to indicate that she ever made a conscious decision to live in this country or to accept any of the responsibilities of a permanent resident. She merely came to acquire the education available and thereby improve her position in her own native country. Obviously, the Petitioner is quite content in having advanced from assistant professor at the University Putra Malaysia prior to obtaining her doctorate to associate professor and Deputy Dean of that *1004 university now. At all times that she was in the United States, her main objective was to personally benefit from this country. Any contribution the Petitioner made to the United States was incidental to this objective.[6] That, to my mind, is totally insufficient to constitute a substantial voluntary connection.
Compare the instant case with Kwong Hai Chew who, as discussed above, had an American-born wife, had become a permanent resident and had already filed a petition for naturalization before he left the country.
In any event, the real complaint that Petitioner has is that she no longer has a visa to come and go as she pleases. We already have, in the record, a statement from the State Department establishing that Petitioner’s removal from the “No Fly” list will not affect its visa determinations as concern her and that she will not get the visa she desires. Neither this action, nor any other court action, can redress her complaint.
Section 1104(a) of Title 8 sets forth the powers and duties of the Secretary of State, specifically excluding the authority to review consular officers’ determinations “relating to the granting or refusal of visas.” Section 1201(1) of Title 8 expressly precludes visa revocations from judicial review. Read together, courts have extended the application of Section 1104(a) to preclude administrative and judicial review of all factual determinations relating to visa applications. See, e.g., Bustamante v. Mukasey, 531 F.3d 1059, 1060 (9th Cir.2008). Courts are therefore deprived of the power to order the State Department to issue a visa.
This is as it should be. These questions are clearly political and should not be resolved by the judicial branch of our government. Thus, the claimed injury of which Petitioner suffers is non-redressable. At a constitutional minimum, “it must be ‘likely,’ as opposed to merely ‘speculative,’ that the injury will be ‘redressed by a favorable decision.’ ” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Petitioner seeks an injunction to remove her name from any government watchlist, including the “No-Fly” list, to enable her passage to the United States to attend conferences and further her professional relationships. Removal of her name, however, does not ensure lawful entry into the United States. Petitioner must first obtain a valid visa.
The majority cites to the District Court’s observation that “[wjhile obtaining a visa may stand as a potential obstacle to her entry into the United States, it does not completely foreclose redressability. Petitioner is not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time.” This may ring true where remaining roadblocks do not preclude a likely redress. Here, however, the State Department based its denial of Petitioner’s visa application on grounds other than her “No-Fly” status. Petitioner’s inability to obtain a valid visa despite her removal from the “No Fly” list or any other government watchlist constitutes more than a “potential obstacle” to her entry — it renders her entry highly speculative at best.
In sum, I would affirm the District Court and hold that the alien Petitioner has no standing to bring this action since she has no substantial voluntary connec *1005 tion to this country. I would further hold that Petitioner’s alleged harm is ultimately non-redressable and thus, she is without standing to bring her claim in this or any other federal court.

. Petitioner sued the San Francisco Airport, City and County of San Francisco, San Francisco Police Department, certain San Francisco Police Department officers, US Investigations Services, Inc. and John Bondanella for false arrest as part of this action. All of her claims against the non-federal defendants were settled for the total sum of $225,000, following her acceptance of the non-federal defendants’ offer to compromise under Rule 68 of the federal Rules of Civil Procedure.

. Although according to Petitioner's brief, her student visa was valid until January 2007, it was due to expire at the end of her studies, which occurred some three months later in June 2005.

. The INA provides, in pertinent part, that any alien
who: (I) has engaged in a terrorist activity; (ii) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity; (iii) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity
is "ineligible to receive visas and ineligible to be admitted to the United States....” 8 U.S.C. § 1182(a)(3)(B).

. "Maintenance and cure” is a benefit given to American seamen under an ancient doctrine that the master of a ship cannot abandon a sick seaman in a foreign port but must see to the well-being of the seaman. Thus, the master must pay for the "cure” of the seaman's injury or illness and to maintain the seaman until he can be returned to the home port. Rules for such expenditures are set in part by the flag of the vessel, in which the seaman served. IB Matthew Bender, Benedict on Admiralty § 42 (7th ed. 2011).

. The majority attempts to analogize Boumediene and the present case by stating that petitioners in both cases simply sought to correct mistakes the United States had made concerning their status. The majority spends much space on the failures of the TSA, the Terrorist Screening Center and other government agencies in managing the "No Fly” and other watchlists. To my mind, the statistics quoted show a real effort on the government's part to reduce the mistakes and to remove as many people from the "No Fly” and other government watchlists as possible. This effort was expended over the entire time that Petitioner was making complaints and pursuing this lawsuit. It seems to me that, if possible, the government would prefer to drop someone from the watchlists rather than have a possible airing (through costly and public litigation) of the mistakes made. All of which, I believe, is evidence that Petitioner's placement on the "No Fly” list was not a mistake.

. In fact, Petitioner's own declaration shows she intended to contribute not to the United States, but to "the construction industry in Malaysia, specifically in the architecture field.”